DENNING WIRE & FENCE CO. v. AMERICAN STEEL & WIRE CO. OF NEW JERSEY.

(Circuit Court of Appeals, Eighth Circuit.   April 10, 1909.)

No. 2,866.

1. PATENTS (§ 6*)—SUBJECT OF PATENTS—FUNCTIONS OF MACHINE.
   The mere function or operation of a machine or other device, as distinguished from the machine or device itself, is not patentable.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 5; Dec. Dig. § 6.*]

2. PATENTS (§ 7*)—SUBJECT OF PATENTS—PROCESSES.
   A patent cannot cover generally any and every means or method for producing a given result.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 6; Dec. Dig. § 7.*]

3. PATENTS (§ 6*)—SUBJECT OF PATENTS—MACHINES.
   While the principle of a machine or device and the mode of its operation are required to be set out in the specification of a patent therefor, they cannot be made the subject of a patent, but only the machine or device itself is patentable.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 5; Dec. Dig. § 6.*]

4. PATENTS (§ 6*)—SUBJECT OF PATENTS—"FUNCTIONS OF MACHINE."
   The phrase "functions of a machine," as used in the patent law, defined as that power or property of the machine of acting in the specific manner designed or intended by its construction; in other words, that which the machine is designed to do, as distinguished from the machine itself, and from the product of its action on something external to itself.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 5; Dec. Dig. § 6.*
   For other definitions, see Words and Phrases, vol. 6, p. 5229; vol. 8, p. 7748.]

5. PATENTS (§ 157*)—CONSTRUCTION—GENERAL RULES.
   A patent is a contract, and the rules for the construction of contracts generally control in its interpretation; and when its terms are plain, and the intention of the parties clearly manifest therefrom, they must prevail; but if its expressions are ambiguous, or its validity or any claim is doubtful, that construction will be given which will sustain rather than destroy the patent.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229, 230; Dec. Dig. § 157.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. PATENTS (§ 42*)—PATENTABILITY—COMBINATION PRODUCING NEW RESULT.

A new combination of old elements or devices whereby a new and useful product is produced or an old product is attained in a more efficient and economical way may be protected by a patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 49; Dec. Dig. § 42.*]

7. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — MACHINE FOR MAKING WIRE FENCE.

The Bates patent No. 577,639, for a machine for making woven wire fence, is not invalid on the ground that its claims are for a mode of operation or principle or function of a machine, but is for the machine itself, designed to produce a certain described fabric; nor are the claims so broad as to include any and every machine for making this same fabric, but it is for a new and novel combination and discloses invention.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

8. PATENTS (§ 237*)—INFRINGEMENT—"MECHANICAL EQUIVALENT."

The term "mechanical equivalent," as used in the patent law, means that each of the ingredients comprising the invention covers every other ingredient which in the same arrangement of the parts will perform the same function, if that was well known as a proper substitute for the one described in the specification at the time of the patent. ·

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 374, 375; Dec. Dig. § 237.*

For other definitions, see Words and Phrases, vol. 5, p. 4461.]

Appeal from the Circuit Court of the United States for the Northern District of Iowa.

For opinion below, see 160 Fed. 108.

Thomas A. Banning (Grimm, Trewin & Moffitt and Banning & Banning, on the brief), for appellant.

Thomas W. Bakewell and Paul Bakewell (Charles MacVeagh, on the brief), for appellee.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

PER CURIAM. The Circuit Court rendered a decree which sustained claims numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 19, 27, and 35 of letters patent No. 577,639, issued on February 23, 1897, to Albert J. Bates, for improvements in wire-fence machines, and adjudged that machines made in accordance with the specifications of letters patent No. 788,305, issued on April 25, 1905, to Joseph M. Denning, were infringements thereof. The Denning Wire & Fence Company appealed from that decree, and its counsel by brief and oral argument have presented every fact and rule of law that learning, ability, and ingenuity could discover to sustain its appeal. Every position of the court has been reviewed in the light of the objections to it which have thus been urged upon our consideration, and our conclusion is that the decree below was right and that it must be sustained. The opinion of Judge Henry T. Reed in the court below so logically and clearly states this case, and the reasons why the decree was rendered, that it is approved and adopted as the opinion of this court. It reads in this way:

"Reed, District Judge. Congress has enacted, in substance, that any person who has invented or discovered any new and useful art, machine, manufacture,

or composition of matter, or any new and useful improvements thereof, not known or used by others before his invention or discovery, may, upon compliance with the law, obtain a patent therefor; that before he shall receive such patent he shall make written application for the same, and file therewith in the Patent Office a written description of the invention, and of the manner of making and using it, in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct, compound, and use the same; and, in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions, and shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention; that, when the nature of the case admits of drawings, the applicant shall furnish the same, which shall be filed in the Patent Office as a part of the specifications, and a copy of the specifications shall be annexed to the patent, if issued, as a part thereof. Rev. St. § 4883 (U. S. Comp. St. 1901, p. 3381) et seq. ·

"The granting of the patent is presumptive evidence of its validity, and of the novelty of the invention. Smith v. Goodyear Co., 93 U. S. 486–498, 23 L. Ed. 952; Cantrell v. Wallick, 117 U. S. 689–695, 6 Sup. Ct. 970, 29 L. Ed. 1017.

"The grounds of the alleged invalidity of the several claims of this patent may be stated and considered in the order in which they are presented in the brief of defendant's counsel.

"The first ground so presented, and it applies to all the claims involved, is: 'That they are functional; that the mechanism is described by the work that it does; that the claims are not limited to any particular or specific mechanism, but are worded broad enough to include all kinds of devices and mechanisms for doing the work and performing the functions specified.' This in reality specifies two distinct and separate grounds, upon each of which the validity of these claims is challenged, viz.: (1) That the claim is only for the functions of certain mechanism, and not for the mechanisms or combinations thereof; and (2) that if they are for a combination of the mechanisms mentioned, then they are so broad as to include every and any kind of mechanism or combinations thereof for making wire fence, and cannot therefore be upheld.

"Elaborate and forceful arguments, with many citations of authorities, are presented by counsel of the respective parties in support of and against these and the other grounds urged against the validity of these claims of this patent. Only brief reference to some of them can be made without unduly extending the opinion.

"That the mere function or operations of a machine, or other device, as distinguished from the machine or device itself, are not the subject of a patent, is well settled. Corning v. Burden, 15 How. 252, 14 L. Ed. 683; Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650; Westinghouse v. Boyden Power Brake Co., 170 U. S. 537–557, 18 Sup. Ct. 707, 42 L. Ed. 1136; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693–708, 45 C. C. A. 544. And a patent covering generally any and every means or method for producing a given result cannot be upheld. O'Reiley v. Morse, 15 How. 62, 14 L. Ed. 601; Leroy v. Tatham, 14 How. 156, 14 L. Ed. 367; The Telephone Cases, 126 U. S. 531–534, 8 Sup. Ct. 778, 31 L. Ed. 863.

"Whether or not a given case falls within the general rules thus stated depends of course upon its own facts. The first question then is, What are the functions of a machine or other device, that are not the subject of a patent? In Corning v. Burden, 15 How. 252, 14 L. Ed. 683, Mr. Justice Grier, in stating the distinction between a process and a machine, said:

" 'The term "machine" includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result. But where the result or effect is produced by chemical action, by the operation or application of some element or power of nature, of one substance to another, such modes. methods, or operations are called "processes." A new process is usually the result of a discovery; a machine, of invention. * * * But the term "process" is often used in a more vague sense in which it cannot be the subject of a patent. Thus we say that a board is undergoing the process of being planed, grain of being ground, iron of be-

ing hammered or rolled. Here the term is used subjectively or passively as applied to the material operated on, and not to the method or mode of producing that operation, which is by mechanical means, or, the use of a machine, as distinguished from a process. In this use of the term it represents the function of a machine, or the effect produced by it on the material subjected to the action of the machine. But it is well settled that a man cannot have a patent for the function or abstract effect of a machine, but only for the machine which produces it.'

"In Le Roy v. Tatham, 14 How. 196, 14 L. Ed. 367, the claim of the patent involved was as follows: 'What we claim as our invention is the combination of the following parts, to wit, the core and bridge or guide piece, the camber, and the die, when used to form pipes of metal under heat and pressure in the manner set forth, or in any other manner substantially the same.' The Circuit Court charged that this patent was not one for the combination of the different parts of the machinery described, but was one for bringing a newly discovered principle into practical application, by which a useful article of manufacture is produced, and wrought pipe made as distinguished from cast pipe. Held, that this was a wrong construction of the patent, as it was for the combination of machinery only; and whether or not the alleged newly developed property of lead used in the formation of pipes might have been patented if claimed as described, without the intervention of machinery, was not in the case. In the course of the opinion it is said:

" 'The word "principle" is used by elementary writers on patent subjects, and sometimes in adjudications of courts, with such a want of precision in its application as to mislead. It is admitted that a principle is not patentable. A principle, in the abstract, is a fundamental truth, an original cause, a motive; these cannot be patented, as no one can claim in either of them an exclusive right. Nor can an exclusive right exist to a new power, should one be discovered in addition to those already known. Through the agency of machinery, a new steam power may be said to have been generated. But no one can appropriate this power exclusively to himself under the patent laws. The same may be said of electricity, and of any other power in nature, which is alike open to all, and may be applied to useful purposes by the use of machinery. In all such cases, the processes used to extract, modify, and concentrate the natural agencies constitute the invention. The elements of the power exist; the invention is not in discovering them, but in applying them to useful objects. Whether the machinery used be novel, or consist of a new combination of parts known, the right of the inventor is secured against all who use the same mechanical power, or one that shall be substantially the same. A patent is not good for an effect, or the result of a certain process, as that would prohibit all other persons from making the same thing by any means whatsoever.'

"Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650, was a suit for an alleged infringement of the original and reissued letters patent for an improvement in machinery for making hat bodies. The original patent was held valid, but not to have been infringed by defendant's. The specification of the reissued patent describes the machine much as it was described in the original, and continues, 'The said mode of operation invented * * * is embodied in the following description,' and the claim is modified to conform to the description. Pages 567–576. The reissued letters patent was held void. In the course of the opinion Mr. Justice Grier, at page 570, says:

" 'The law requires that the specification should set forth the principle and the several modes in which the patentee has contemplated the application of that principle, or character, by which it may be distinguished from other inventions, and shall particularly point out the part, improvement, or combination which he claims as his own invention or discovery. We find here no authority to grant a patent for a principle or mode of operation, or an idea, or any other abstraction. A machine is a concrete thing consisting of parts, or of certain devices and combination of devices. The principle of a machine is properly defined to be its mode of operation, or that peculiar combination of devices which distinguish it from other machines. A machine is not a principle or an idea. The use of ill-defined abstract phraseology is the frequent source of error. * * * Because the law requires a patentee to explain the mode of operation of his peculiar machine, which distinguishes it from others,

it does not authorize a patent for a "mode of operation" as exhibited in a machine. * * * The specification of this reissued patent, instead of describing, first, the machine and the several devices, which exhibit its peculiar mode of operation in order to produce the desired effect, and stating what the patentee claims as his peculiar invention, commences by describing "a mode of operation" as the thing intended to be patented, and uses these words, "The said mode of operation, * * * is embodied in the following description of the mode of application." The claim is for the mode of operation, substantially as herein described. We have no leisure for a further development of this novel form of patent, or how, by the use of general and abstract terms, the specification is made so elastic that it may be construed to claim only the machine, or so expanded as to include all previous or future inventions for the same purpose. * * * In this case we have an attempt to convert an improved machine into an abstraction, a principle or mode of operation, or a still more vague and indefinite entity often resorted to in argument—an idea.'

"In Westinghouse v. Boyden Power Brake Co., 170 U. S. 537-557, 18 Sup. Ct. 707, 716, 42 L. Ed. 1136. Mr. Justice Brown, after reviewing the prior decisions, said: 'Where the process is simply the function or operative effect of a machine, the cases are conclusive against its patentability; but where it is one which, though ordinarily and most successfully performed by machinery, may also be performed by simple manipulation, such, for instance, as the folding of paper in a peculiar way for the manufacture of paper bags, or a new method of weaving a hammock, there are cases to the effect that such a process is patentable. * * * But this case does not call for an expression of our opinion upon this point, nor even upon the question of whether the function of admitting air directly from the train pipe to the brake cylinder be not patentable (as held by the Court of Appeals), since there is no claim made for this in this patent, and the whole theory of the specification and claims is based upon the novelty of the mechanism.' It is then held that the claim is not infringed by defendant's patent.

"In National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693-708, 45 C. C. A. 544, the specifications upon which claims 1, 2, and 7 of the second Hiens patent there involved, rest, describe the means of producing the so-called 'camber,' or the compression member of the brake beam, as 'The turning of the nuts upon the ends of the tension rod, or member of the beam, thereby causing the compression member to arch or curve, and thus produce the desired adjustible elasticity or resilience in the beam.' In speaking of this, the court, at page 708 of 106 Fed. and page 559 of 45 C. C. A., says: 'The camber or resilience in the beam is one of the products or functions of the air-brake beam of the first patent; not, indeed, the ultimate function which that beam was created to perform—the function of stopping cars—but nevertheless a function of that device, because it may be produced by the use of that combination by simply turning the nuts upon the ends of its tension rods. Now, the function or result of the operation of a machine or combinaton is not patentable, and therefore the camber in the beam (its spring or resilience) could not be monopolized by means of a patent. The means, the mechanical device, by which that camber was produced, and that alone, was capable of protection by such a franchise.' There, the attempt was to monopolize the function or operation of a device acting upon, or within, itself, and not a device or machine designed to act upon something external to itself.

"Other cases are to the same effect; and the rule deducible from the authorities is that, while the principle of a machine or device and the mode of its operation are required to be set forth in the specifications, these are not the subject of a patent, but only the machine or device itself may be patented. True, in some of them it is said that the result of the operations of a machine is not the subject-matter of a patent; but the word 'result' is obviously so used to express the thought that the effect or result of the operations of a machine may not be exclusively appropriated to prevent others from accomplishing the same results by substantially different means. Le Roy v. Tatham, 14 How. 156-174, 14 L. Ed. 367; O'Reiley v. Morse, 15 How. 62-119, 14 L. Ed. 601; Mitchell v. Tilghman, 19 Wall. 392, 22 L. Ed. 125; Robinson on Patents, § 147.

"To say broadly that the effect or result of the operations of a machine may not be patented is at least inaccurate, for if the result of such operations upon some object, apart from the machine itself, is to produce a new and useful article of manufacture not before known, that product may be the subject of a patent apart from the machine which produces it.

"The most usual signification of the word 'function' is: 'The fulfilment or discharge of a set duty or requirement; exercise of a faculty; that power of acting in a specific way which appertains to a thing by virtue of its special constitution.' Century Dictionary.

"An exact definition of the phrase 'functions of a machine,' that will apply in all cases arising under the patent law, may not be readily formulated; nor is it advisable that it should be attempted, for it is impossible to foresee the combinations of elements that may be made to produce new results. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537–557, 18 Sup. Ct. 707, 42 L. Ed. 1136. But for present purposes it may be said to be that power or property of the machine of acting in the specific manner designed or intended by its construction; in other words, that which the machine is designed to do, as distinguished from the machine itself, and from the product of its action upon something external to itself.

"Are these several claims of this patent in question for the 'functions of a machine,' as so understood, or are they for a machine that is endowed with certain functions? This is to be determined from the language of the several claims, considered in connection with the specifications and drawings which are a part thereof. The specifications are as follows:

"'Be it known that I, Albert J. Bates, * * * have invented certain new and useful improvements in wire-fence machines, of which the following is a full, clear, and exact description such as will enable others skilled in the art to which it appertains to make and use the same:

"'The invention relates to the manufacture of woven-wire fences; and the general object in view is to make by machinery, at one operation, in continuous lengths, a complete fencing or fence fabric, consisting of a plurality of longitudinal strand-wires having transverse stay-wires or braces spanning the spaces between the strand-wires, and secured thereto, so as to connect them together, and strengthen and support them.

"'This style of fencing is not new, and it has already been proposed to make the same by machinery at one continuous operation, but in doing so the transverse stay-wires corresponding to the spaces between the strand-wires have been divided into sets or groups, the individual wires of which correspond only to alternate spaces between the strand-wires, and these sets or groups have been fed in and secured to the strand-wires alternately, so that in the completed fencing the stay-wires are not continuous across the fabric, but are so located and arranged that at any given point of the fencing only alternate spaces between the strand-wires are crossed, the other spaces not being crossed by the stay-wires, and the longitudinal wires not being connected at all at that point.

"'It is the particular object of the present invention to provide a machine that will make this kind of fencing, so that in the completed fabric all the longitudinal wires, or as many as may be desired, will be connected together by transverse stay-wires that are practically continuous and in line with one another, and this I accomplish by feeding all the stay-wires in simultaneously and in line with one another crosswise of the strand-wires, and securing them to the strand-wires and to one another, thereby producing a fencing of superior strength, rigidity, and effectiveness and of a greatly improved appearance; and the invention consists in a machine organized and having its elements combined as hereinafter claimed and as contained in the machine herein illustrated and described as the best embodiment of the invention at this time known to me.'

"Accompanying the specifications and forming a part thereof are twenty-four drawings representing different parts of the machine. These parts, and their combinations with each other to form the completed machine, the manner in which they are designed to act together and upon the wire fed into the machine to produce a completed fence fabric, are described with much detail, and illustrated by appropriate references to the different drawings.

After so describing the several parts, the construction of the machine, and the manner of its operation, the specifications continue:

" 'In the following claims I do not wish to be understood as limiting myself as to the details of construction of the individual elements going to make up the several parts or combinations of the machine herein illustrated and described, as I regard the invention as of a character to admit of variations of these details within considerable limits without departing from its spirit or scope. For example, the details of the coilers, the cutters, the feeding and take-up mechanisms, and other parts may be differently constructed so long as the organization, relative arrangement, and combinations are preserved, and the framing of the machine, the gearing, etc., are features that admit of a wide range of modification within the skill of the designer and machine-constructor.

" 'Having thus described the invention, what I claim, and desire to secure, is:

" '(1) In a wire-fence machine, the combination of mechanism for intermittently feeding a plurality of longitudinal strand-wires, mechanism for intermittently feeding a plurality of stay-wires simultaneously and transversely of the strand-wires, mechanism for cutting off suitable length of the stay-wires to span the space between the strand-wires, and mechanism for simultaneously coiling the adjacent ends of the lengths of the stay-wires around the strand-wires.'

"The other claims vary somewhat in their phraseology, and some are repetitions to some extent of others; but each is for a combination 'in a wire-fence machine' of mechanisms designed to act together and upon wire fed into the machine so as to guide it through the same and to different parts thereof, cutting, intercoiling, and transforming it into a completed fence fabric as it passes through and emerges from the machine.

"A patent is a contract between the government and the patentee, whereby the latter is granted the exclusive right to make, use, and vend his invention for a specified time, after which such right is to inure to the benefit of the public. Seymour v. Osborne, 11 Wall. 516–533, 20 L. Ed. 33. And the rule for the construction of contracts generally controls in its interpretation, and when its terms are plain, and the intention of the parties clearly manifest therefrom, they must prevail. If its expressions are ambiguous, or its validity or any claim thereof is doubtful, that construction will be given to it which will uphold, rather than that which will strike down and destroy, the patent. National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693–701, 45 C. C. A. 544; Jewell Filter Co. v. Jackson, 140 Fed. 340–343, 72 C. C. A. 304.

"The specifications are a part of the patent (Rev. Stat. § 4884 [U. S. Comp. St. 1901, p. 3381]); and the claims will be considered in connection with such parts of the specifications as are applicable thereto in determining their meaning. With these principles in mind, what is the meaning of these several claims? The patentee says:

" 'Having thus described the invention, what I claim and desire to secure is:

" 'In a wire-fence machine, the combination of (1) mechanism for intermittently feeding a plurality of strand-wires; (2) mechanism for intermittently feeding a plurality of stay-wires simultaneously and transversely of the strand-wires; (3) mechanism for cutting off suitable lengths of the stay-wires to span the spaces between the strand-wires; and (4) mechanism for simultaneously coiling the adjacent ends of the lengths of the stay-wires around the strand-wires.'

"The others are in substantially the same form. Standing alone, the claims are plainly for a combination of four groups of mechanisms into a 'wire-fence machine'; but the machine itself, and its principle and mode of operation are not, and cannot be, accurately described without the aid of drawings or a model, and an attempt to do so would be unavailing. The specifications, however, and the drawings which are a part thereof, particularly describe, and plainly show, a machine the principles and mode of operation of which, and the several elements composing the same, are exactly described and clearly set forth with much detail; and the plain meaning of the language of the several claims in connection with the specifications applicable to each is a distinct claim for a machine that, when built and operated in the manner described and pointed out, will produce a wire-fence fabric, and is not a claim

for a 'mode of operation,' a 'principle', or a function of a machine or any part thereof, apart from the machine itself.

"Are the several claims so broad as to include any and every kind of a machine for making a woven wire-fence fabric, such as is described? This question has been carefully considered, and it must suffice to say that they are not. The specifications clearly describe the several component parts, and their combination to form a new machine; and the claims are only for the combination of the mechanisms, or their substantial equivalents, within the scope of the organization as described, to do the work that this machine is designed to do.

"It will be observed that none of the claims contain the words 'substantially as described,' or words of similar import; and it is urged that this omission, in connection with the paragraph immediately preceding the claims, shows the intention of the patentee to make the claims so broad as to include all other means of making a woven wire fence. Many authorities are cited to show the purpose of the use of such words in the claims. They are doubtless used to limit the claims to substantially the descriptions set forth; or, if the description should be lacking in perspicuity, they may permit such latitude in construction as will conform the part substantially to that described. If necessary to save the patent, these words will be construed into the claim. Hobbs v. Beach, 180 U. S. 383–400, 21 Sup. Ct. 409, 45 L. Ed. 586. But it is said that this will not be done when it appears that their omission is intentional, and for the express purpose of making the claim so broad as to include every other device or means for accomplishing the same result. But the specifications upon which these several claims rest are so explicit that neither the use nor the omission of these words can affect the meaning of these claims. The conclusion, therefore, is that the first ground urged against the validity of the claims is not tenable.

"The second ground is that the devices and mechanisms called for in each claim are only the devices and mechanisms of the old barbed wire fence machines in plural instead of singular relation, and are mere multiplication of such devices which involve no invention, but only mechanical knowledge and skill in arranging such mechanisms. Many machines for barbing wire were in use at the time of the issuance of the Bates patent, and the patents for a number of them have been offered in evidence by the defendant. All of them are, as their names indicate and their construction shows, machines for placing barbs upon fence wire. The wire so barbed is a single strand, or two strands twisted together as one in the form of a cable. and the barbs are coiled around the strand, or intercoiled with it when it consists of more than one wire, to hold the barbs in place. In most, if not all, of these machines, the main strand of wire is fed forward from a spool of wire into, and is drawn through, a tube, and the wire for the barb is fed in a like manner through a tube transversely to the main strand and fastened to or coiled around the main wire in different ways, then cut and pointed, to form the barb, and thus make a completed strand of barbed wire. Cuts of such wires and the manner of making them are shown and described in the Cases of the Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 450, 36 L. Ed. 154. Many, and perhaps all, of the devices and mechanisms used for making the barbed wire may be used in making the woven wire, or meshed wire fence fabric, shown in the patents of Bates and of the defendant in this suit. As evidencing the presence in the barbing wire machines of the sets of mechanisms which the Bates patent calls for, defendant refers to the Putnam reissued patent. No. 9,485, of November 30, 1880, and the Baker patent, No. 249,735, of November 22, 1881, as sufficiently illustrating the general features of the mechanisms in use in the barbing-wire machines, and quotes from the Putnam patent the first and second claims thereof. The second embraces both, and is as follows:

" '(2) In a machine for making barb fence wire by a continuous operation, the combination, with mechanism constructed and arranged to automatically feed forward the main wire at stated intervals, and mechanism constructed and arranged to automatically feed forward the cross or barb wire across the main wire at stated intervals, of mechanism for coiling the barb wire about the main wire, and mechanism for cutting off the barb wire, and for fasten-

ing the coil barb wire to the main wire, in connection with guides for the wire, substantially as described.'

"It is true that this calls for groups of mechanisms for automatically feeding the main and cross wires, and for guiding, coiling, and cutting the same as the claims of the Bates patent do; but it by no means follows that the combinations are the same. If this proves anything, it is only that such mechanisms were old and well known at the time of these earlier patents, and that their combinations into the various barbing wire machines were patentable inventions. Bates does not claim to have invented originally any of these mechanisms, and claims only to have arranged and invented a new combination of them different from any before known for making a product entirely different from that which they made, or could make, viz., a completed wire-fence fabric, just as Putnam and Baker and others combined them into machines for barbing separate strands of wire. It requires no citation of authorities to show that a new combination of old elements or devices, whereby a new and useful product is produced, or an old product is attained in a more efficient and economical way, may be as securely protected by patent as a new machine or other device, or a new composition of matter. Seymour v. Osborne, 11 Wall. 516–542, 543, 20 L. Ed. 33; Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693–707, 45 C. C. A. 544.

"The distinction between a fence wire and a wire fence is as broad as the distinction between a fence board and a completed board fence; and a machine for placing the barbs upon a wire may be as different from one for making a completed wire-fence fabric as the strand of wire is different from the completed wire fence, or the board is different from the completed board fence, or, in fact, from any structure into which the wire or the timber may be erected. A comparison of the specifications of the Putnam and other barbing wire machine patents with those of the Bates patent shows that the combinations of the old mechanisms into the barbing wire machines are as different from those of the Bates machine as a single strand of barbed wire, of whatever kind, is different from the woven wire, or meshed wire, fence fabric that Bates describes, and which his machine is designed to, and does, produce. In none of the barbing wire machines is a combination of mechanisms shown for the purpose for which Bates combined them, nor do they, nor can they, perform the same functions that the Bates combination performs. It is true that they feed the strand-wires forward, and the wire for the barbs across the main wire, and coil it around or intercoil it with the main wire; but there is no combination of mechanism for feeding the barb wire across an intervening space between several strand-wires distant from each other, and binding and sustaining them in that position, unless it be the Ayers & Decker machine of 1876, not patented, which will be referred to later. For instance, the Root patent, No. 237,129, of February 21, 1881, is for an improved machine for winding barbed fence wire, and relates to a new method of applying barbs to a strand composed of two wires around which the barb is wound. The strands are fed through two tubes which converge to form a single strand composed of two wires side by side, in close proximity; and the barbs are wound around one, and then around both. It relates simply to the method of applying the barbs, and is differentiated only from the Ayers & Decker patent, No. 235,331, of December 14, 1880, in the method of applying the barb, which is for the same purpose, and interwinds the barb with the two wires twisted to form a cable strand.

"It is undoubtedly true that merely bringing together old elements found in older machines in the same, or a kindred art, to effect the same result, is not patentable invention. But the converse is equally true, that if a new combination or organization of old elements is such that the combination produces a new mode of operation, and a new product or beneficial result, this is patentable invention, though all of the constituents of the new combination were well known and in common use before that combination was made. The new result, however, must be the product of the joint and co-operating action of all of the old elements as combined in the new machine, and not merely the aggregate of different results each the separate product of one of the con-

169 F.—51

stituent elements. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Pickering v. McCullough, 104 U. S. 310, 26 L. Ed. 749.

"In showing the existing state of the art at the time of the Bates patent, defendant produced and put in evidence two cuts, and a model of a machine used in 1876, 1877, and 1878 by Ayers & Decker, of Bushnell, Ill., for barbing wire. That such a machine was used by them in those years, and until they were restrained from using it at the suit of Washburn, Moen & Co., in the Circuit Court of the United States for the District of Illinois in 1878, is not disputed. The cuts above referred to are reproduced from exhibits used in evidence in that suit, and the model is one prepared by the defendant for use upon this hearing from the testimony in this case relative to its construction. The cuts and model show the method of barbing a single wire, and, by the addition of like devices, show the method of barbing two and three strands at a distance from, and parallel to, each other.

"In the case of the two and three parallel strands, the barb or cross wires were cut the requisite length by hand and placed across the intervening space between the strand-wires, and were then wound around the strand-wires to sustain them in their relative positions, and the ends of the cross-wires turned outwards to form the barbs. There is much testimony in regard to this machine, and especially the kind of fence made with it, and the method of wrapping the cross-wires around the strand-wires. That a three-strand barbed-wire fence was made is not doubted, but whether the cross-wires were laid in line with each other across the strands and their meeting ends intercoiled with a single coiler containing two lugs or fingers, or were alternated in zigzag or staggered form, is in much dispute. Much of the testimony upon this question relates to matters occurring nearly 30 years before the witnesses gave their testimony, most of whom had but little interest in the matter at the time, and would not be likely to charge their memories therewith. Without reviewing the testimony, it must suffice to say that it is of that character which fails to convince beyond reasonable doubt that Ayers & Decker made a three strand wire fence with the cross or stay wires in alignment. The Barbed Wire Patent, 143 U. S. 275–284, 12 Sup. Ct. 443, 450, 36 L. Ed. 154.

"In June, 1876, Mr. Decker, of the firm of Ayers & Decker, made application for a patent upon his mesh fencing, and he described it as one in which the stay-wires were arranged in zigzag or staggered form only. This is persuasive evidence that that was the only style of fence that he or his firm then manufactured. But if it were conceded that the Ayers & Decker machine was made and used in the manner contended by the defendant, it is so radically different from the Bates machine that the conclusion is that it does not anticipate that machine. The product of this machine was simply the aggregate of the separate products of each of the elements used to feed forward the separate strand-wires parallel to and at a distance from each other, when the cross-wires were then laid by hand across the strand-wires and fastened to hold them in position and form the barbs. Old elements were used and operated separately for feeding forward the several strand-wires, and the cross-wires were then placed in position by hand to produce the two and three strand-wire fence, while Bates combined the old elements so that they acted jointly, and in co-operation with each other to feed forward the three strand and cross wires simultaneously, cut and coil the cross-wires, and then completed the fence fabric.

"It would serve no useful purpose to refer in detail to others of the many barbing wire machine patents offered in evidence by the defendant, and point out the difference between each and the Bates patent. A careful examination of each of them leads to the conclusion that none of them anticipates the Bates patent, and that none is intended to perform the same function, or does or could in fact perform the same, or produce the same product that the Bates machine is designed to, and does in fact, produce.

"The third ground is that the several claims are but simple changes in the prior patents of square-mesh fence-making machines, especially of the Edenborn patent, which changes involve no invention, but only mechanical skill in view of the old barbing wire fence machine.

"This is but a repetition of the second ground modified to apply to the patents of the square-mesh fence machines, especially the Edenborn patent. No. 558,787, of April 21, 1876. In argument, the patent of Page & Lamb, No.

414,844, of November 12, 1889, and of Land, No. 455,406, of July 7, 1891, are referred to as sufficiently illustrating these machines, and embodying all of the claims of the Bates patent involved in this suit, combined in substantially the same form. The features that distinguish the first two patents from that of Bates are that in both of them the desired number of strand or longitudinal wires are fed forward a predetermined distance and stopped; a single wire is then fed across the strand-wires continuously, and wound around each while they are at rest until all of the strands are wound; the cross-wire is then cut, and the completed fabric moved forward the requisite distance for the next cross-wire, and the operation of winding the cross-wire around the strand-wires is repeated. Instead of using a single continuous cross-wire, Bates combined mechanisms for feeding several cross-wires in line across the intervening spaces between the strand-wires, simultaneously with the feeding of the strand-wires, and for cutting the cross-wires of sufficient length to cover such spans, then stopping both strand and cross wires while the coiling fingers engage and coil the ends of the cross-wires around the strand-wires, when the completed fabric is then fed forward and the operation repeated. It is obvious that this requires different mechanisms and an entirely different mode of operation from that for feeding a single continuous wire across the strand-wires while they are at rest, and then winding it around those strands; and that the operation of the Bates machine is much more rapid than that of the others, permits of the use of stronger and more efficient stay-wires, and winds them more securely upon the strand-wires. The Edenborn patent also feeds forward the several strand-wires, stops them, and then feeds the stay-wires across them while the strand-wires are at rest, but in alternate, or zigzag or staggered, form, and not in a continuous line. Edenborn himself was a skilled mechanic of large experience in the manufacture of wire-fence material, and applied for his patent only a short time before Bates applied for the patent in suit. The estimate that Edenborn placed upon his own patent as compared with that of Bates is shown by the payment of his company to Bates by his direction of the sum of $80,000 for the patent in suit, and that of the fence that it is designed to manufacture. This, at least, is persuasive evidence that Edenborn did not then regard the Bates machine patent as an infringement of his, or that it was simply the result of the knowledge and skill of the mechanic in arranging the old elements.

"It requires the combination and joint co-operation of devices for feeding forward simultaneously at least three strand-wires and two stay-wires transversely to them, for guiding the stay-wires across the spaces between the strand-wires, and for cutting, coiling, and intercoiling the ends of the stay-wires around the strand-wires, to complete the Bates machine and illustrate its principle and mode of operation. The width of the fence fabric it is desired to produce may then be increased to any desired extent by adding one each of these several devices in the same relation to each other as in the original combination, and one stay-wire for each strand-wire that it is desired to add to the fence. The addition of such other devices may be only the work or skill of the constructor of the machine, but a combination of devices for feeding simultaneously the strand and cross wires, guides for the stay-wires across the spaces between the strand-wires, and for cutting the stay-wires and coiling and intercoiling them around the strand-wires, is not shown in any of the prior patents or machines used for barbing wire or making mesh-wire fence. That the machine is one of great utility and went into immediate use, and practically supplanted all prior machines for making mesh-wire fencing, cannot be doubted under the evidence upon that question.

"Finally, it is urged that defendant does not infringe the complainant's patent in any particular. It may be admitted that the several claims in question of the Bates patent must be limited to the devices or means described in the specifications, or to their substantial equivalents. Lake Shore & M. S. Ry. Co. v. National Car Brake Shoe Co., 110 U. S. 229–237, 4 Sup. Ct. 33, 28 L. Ed. 129; Westinghouse v. Boyden Power Brake Co., 170 U. S. 557, 18 Sup. Ct. 707, 42 L. Ed. 1136; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693–710, 45 C. C. A. 544.

"The term 'mechanical equivalent,' as used in the law of patents, means that each of the ingredients comprising the invention covers every other ingredient,

which, in the same arrangement of the parts, will perform the same function, if that was well known as a proper substitute for the one described in the specifications at the time of the patent. Imhaeuser v. Buerk, 101 U. S. 647–656, 25 L. Ed. 945; National Hollow B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693–710, 45 C. C. A. 544.

"The defendant in his first patent, No. 772,405, of October 14, 1904, describes his invention as one that 'relates to the manufacture of wire fence in which the main longitudinal strands of wire are connected at regular intervals by cross-wires, or the "stay-wires," as they are usually called,' and says: ' * * * The machine is designed to manufacture the type of fence partially illustrated in Fig. 8, in which the longitudinal strands * * * are connected by stay-wires extending from strand to strand and closely wound about the strands. At the outer strands this is a simple coil, but at the intermediate strands the connection is in the form of a peculiar knot, the form of which is due to the fact that, prior to coiling, the stay-wires are fed across the ends of the coilers both on the same side of the strand-wires. The knot so formed takes a very firm grip on the strand-wire, and, irrespective of the crimp taken in it, tends to hold the stays securely in position. The machine is arranged to feed, cut off, and coil simultaneously as many stay-wires as there are spaces between strand-wires in the fence to be made. It also feeds forward the finished fence, crimps the main strands at each stay-wire intersection, and rolls the completed fence web on a reel.' Reference is then made to the drawing for a detailed description of the machine. The fence described is exactly that described in the Bates patent, with the exception of the knot in the coil of the stay-wires around the intermediate strand-wires. Having thus described the invention, the claims are:

" '(1) In a wire-fence machine, the combination of mechanism for intermittently feeding a plurality of longitudinal strand-wires, mechanism for simultaneously and intermittently feeding a plurality of stay-wires transversely and so as to cross each other in pairs, both lying on the same side of the strand-wires, a cut-off for the several stay-wires, and coilers to knot them around the strand-wires.'

"The second and third are substantially the same, and the others, 15 in number, describe the mechanisms or devices which are combined to form the machine.

"For convenience of comparison, the first claim of the Bates patent is here repeated:

" '(1) In a wire-fence machine, the combination of mechanism for intermittently feeding a plurality of longitudinal strand-wires, mechanism for intermittently feeding a plurality of stay-wires simultaneously and transversely of the strand-wires, mechanism for cutting off suitable lengths of the stay-wires to span the spaces between the strand-wires, and mechanism for simultaneously coiling the adjacent ends of the lengths of the stay-wires around the strand-wires.'

"The only difference between these claims is that in the defendant's machine the stay-wires are fed in upon the same side of the strand-wires, and the coilers are to knot the adjacent ends of the stay-wires around the intermediate strand-wires, while in the Bates machine the stay-wires are fed in upon opposite sides of the strand-wires, and there is no knot in the coils. True, the combinations need not necessarily be the same; but a comparison of the specification and of the models of the two machines exhibited upon the hearing show beyond any doubt that the combinations in the two machines are the same, and that the devices for feeding the strand and cross wires and for coiling the ends of the stay-wires around the strand-wires are identical, except that which forms the knot mentioned in the defendant's claims, and that only one of the stay-wires is fed in on the opposite side of one of the outer strands. The only difference, therefore, in the devices of the two machines and in their modes of operation is in those for cutting the stay-wires, and for releasing them from the grooves into which they are guided and held in position while their ends are cut and coiled or knotted around the strand-wires. A reference to the drawings and models of the two machines is necessary to a correct understanding of these devices.

"The doctrine of mechanical equivalents applies to a patent for a combination of old elements as well as to a patent for any other invention; but whether or not one device is the equivalent of another is usually a question of fact, which it is sometimes difficult to determine. In Gill v. Wells, 22 Wall. 1–29, 22 L. Ed. 699, it is said:

" 'Questions of the kind usually arise in comparing the machine of the defendant in a suit for infringement with that of the plaintiff, and the rule is that, if the defendant omits entirely one of the ingredients of the plaintiff's combination without substituting any other, he does not infringe, and if he substitutes another in the place of the one omitted which is new or which performs a substantially different function, or even if it is old but was not known at the date of the plaintiff's patent as a proper substitute for the omitted ingredient, he does not infringe. By an equivalent in such a case it is meant that the ingredient substituted for the one withdrawn performs the same function as the other, and that it was well known at the date of the patent securing the invention as a proper substitute for the one omitted in the patented combination. Hence it follows that a party who merely substitutes another old ingredient for one of the ingredients of a patented combination is an infringer if the substitute performs the same function as the ingredient for which it was substituted, and was well known at the date of the patent as a proper substitute for the omitted ingredient.'

"It will be observed that the only difference between the cutting devices of the Bates and defendant's machine is that in the Bates machine the movable cutter bar is drawn towards the stationary bar by the two eccentric levers at each end thereof, cutting the stay-wires as the blades of the cutters pass each other, while in the defendant's machine the movable bar is pivoted at one end to a crossbar, and the other end is drawn towards the stationary bar by means of a lever at that end, the cutters passing closely upon the sides of the cut-off plates cutting the stay-wires after they have passed through the openings in those plates. There is no substantial difference in the method of operating the movable cutter bar of each machine. The swinging movement of the bar pivoted at one end, by the lever at the other end, is the substantial equivalent of the movement of the other by the eccentrics at each end, and each performs exactly the same function, viz., the passing of the cutter blades upon the movable and stationary bars to sever the stay-wires. The feeding of the stay-wires through the cut-off plates, so called, in defendant's machine, is identical with that of the Bates machine, in which the stay-wires are fed through perforations in the cutter blades upon the stationary bar. The same is true of the guides in each machine for conducting the stay-wires across the spaces between the strand-wires. The guiding plates of defendant's machine are the exact equivalents of the spring-hinged plates of the Bates machine, the only difference being that in defendant's machine there is but one groove upon the inner surface of one of the plates, and that may be in either, or there may be a groove in each plate, while in the Bates machine there is a groove in each of the plates, or one in either will perform the same function. In the defendant's machine the movable plates are moved to and from the stationary plate by means of a lever actuated by a cam and springs, while in the Bates machine a spring-hinge upon the plates presses the movable plate upon, and holds it to, the stationary plate. No element of the Bates machine, therefore, is omitted from that of the defendant, without substituting an equivalent therefor.

"There is one difference, however, in the operations of these devices in the two machines for opening the guides. In the Bates machine the movable plates open and close on their hinges, as a door opens and closes upon its hinges, by the pressure of the stay-wires upon them in the forward movement of the fence fabric after it is completed, while in defendant's machine the movable plates are moved away from the stationary plates by levers, which open the guides and release the stay-wires after the fence fabric has been completed. The movement of the fence alone does not perform this function in defendant's machine, for if the plates were not opened by means of the levers the movement of the fence fabric may wreck the plates. It is true that this movement of the levers is actuated by the tension of springs, and thus the plates

are separated, while in the Bates machine the direct action of the springs closes or brings the plates together to form the guides; while in the defendant's machine it separates the plates and opens the guides through the intermediary of the levers. It was well known, however, at the time of the Bates patent that springs, levers, and weights were used to produce pressure, and that one was a substitute for the others for this purpose. Bates utilized the pressure of the fence fabric in its movement forward to separate the guide plates and release the stay-wires from their confinement. The defendant applies the pressure produced by the tension of the springs in the operation of the machine for the same purpose, and in substantially the same way, and by substantially the same means. Morley Machine Co. v. Lancaster, 129 U. S. 263–289, 9 Sup. Ct. 299, 32 L. Ed. 715; Hobbs v. Beach, 180 U. S. 383–399, 401, 21 Sup. Ct. 409, 45 L. Ed. 586; Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935. In the last named case it is said:

" 'The correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result. Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained.'

"The authorities concur in holding that the substitution of an equivalent of a thing in the sense of the patent law is the same as the thing itself; so that if two devices do the same work in substantially the same way and accomplish substantially the same result, they are the same, even though different in name, form, and shape. With this principle in mind, it seems clear that both the cutting device and that for opening the guides, used by the defendant, are the substantial equivalents of those of the Bates machine for the same purpose.

"The knotting feature of defendant's coiling device may differentiate it to that extent from the Bates device. But this is an immaterial difference only as it in no way changes the functions of the machine as a whole, and accomplishes no result substantially different from that of the Bates machine. Morley v. Lancaster, and Hobbs v. Beach, above.

"If defendant desires to use that feature of its coiler alone, it may do so, but it cannot escape infringement by building it upon the Bates coiler without complainant's consent. Cantrell v. Wallick, 117 U. S. 689–694, 6 Sup. Ct. 970, 29 L. Ed. 1017; Hobbs v. Beach, above.

"Defendant's second patent is for a machine to manufacture a wire fence, the longitudinal strands of which are composed of two or more strands twisted in the form of a cable and plain cross or stay wires connecting them at regular intervals. It is not claimed by the defendant that this is a material difference from the first machine, and upon the argument at the bar it was distinctly stated by its counsel that nothing was claimed for this feature of the machine. It need not therefore be considered.

"Other reasons are urged in behalf of defendant why its machine does not infringe that of Bates, but they seem to be fully answered in National B. B. Co. v. Interchangeable B. B. Co., 106 Fed. 693, 45 C. C. A. 544. The conclusion, therefore, is that the complainant is entitled to a decree as prayed, and one may be prepared accordingly."

The decree below must be affirmed, and it is so ordered.