(C. D. 828)

Testing Machines, Inc. *v.* United States

United States Customs Court, Second Division

(Decided February 2, 1944)

*John D. Rode* (*Howard C. Carter* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before TILSON, KINCHELOE, and LAWRENCE, Judges

LAWRENCE, Judge: Two importations of a device referred to in the record as a "Canadian Standard Freeness Tester" were classified by the collector of customs as articles, not specially provided for, composed in chief value of copper, and duty was assessed thereon at the rate of 45 per centum ad valorem in accordance with the provisions of paragraph 397 of the Tariff Act of 1930. An additional duty of 3 cents per pound was imposed pursuant to the terms of section 3425 of the Internal Revenue Code (53 Stat. 415; sec. 601 (c) (7) of the Revenue Act of 1932). This latter assessment is not challenged.

Plaintiff claims in its protest that the importations are properly classifiable under the provision for "all other machines, finished or unfinished, not specially provided for," or for "parts" thereof, and dutiable at the rate of 27½ per centum ad valorem under paragraph 372 of said tariff act. By amendment of the protest it is also claimed that the imported articles should be classified as parts of machines for making paper pulp or paper, and dutiable at the rate of 20 per centum ad valorem under said paragraph 372, as amended by the trade agreement with Sweden, T. D. 47785, 68 Treas. Dec. 19, 29.

Counsel for the respective parties, in their briefs, have referred to a further claim that the merchandise should be classified under the provision for "machines for making paper pulp or paper" in said paragraph 372, as amended, *supra*. Doubtless this reference was inadvertently made, inasmuch as that claim has not been invoked by the pleadings, and for that reason it will not be considered by the court.

Arthur F. Brinkman, the only witness in the case, testified that he had been employed for approximately 6 years as sales manager of the plaintiff-corporation; that "We manufacture and are also agents for various types of testing instruments"; that he has handled every one of their importations; that "the Canadian standard freeness testers are all the same" and "are calibrated by the Forest Products Laboratories, of Montreal, Canada, which is a Government laboratory

and each Canadian standard freeness tester imported is exactly the same."

The witness further testified that he was familiar with the functions of freeness testers like those in controversy, having operated them "in our own shop, but not in a mill" and had read literature on the subject. He produced a pictorial representation of the imported testers, which was received in evidence as plaintiff's illustrative exhibit A, hereinafter referred to as exhibit A.

It is not clear from the testimonial record precisely how these instruments are adjusted for use in a paper mill, the witness stating that "They are right alongside the beater machine—the beating machines, the machine that beats the pulp." However, aided by the pictorial representation (exhibit A), it would appear that the device is in two sections, each fastened, one above the other, to a panel, which in turn is apparently bolted to an upright surface. The function of the device is to determine the "beating degree of the pulp, or, in other words, how fine or how coarse the pulp is beaten." A more detailed description of the tester and its actual operation may be briefly stated as follows:

The upper section is in the nature of a cylindrical container having a wire strainer or screen, which is calibrated, near the bottom. The top, and the bottom, of the container are hinged, so that they may be opened or closed at will by means of so-called cam levers, which, judging from the design (exhibit A), are operated by hand, although the record is silent on that point.

When in use a solution, consisting of two grams of paper pulp which has been dried and mixed with 1,000 cubic centimeters of water, is poured into the cylindrical vessel above described. A pet cock in the cover remains open to permit the escape of "any excess air which might accumulate in that upper cylinder." The bottom of the vessel is then opened to allow the water in the mixture to run into the lower section of the apparatus, which is appropriately adjusted directly beneath the container above referred to. This is a funnel-shaped container, or drainage funnel, having what the witness characterized as a lower, and an upper, orifice. When the mixture flows into this container the water runs out through the lower orifice, which is calibrated, and also out of the upper orifice. "The amount of water which comes through the upper orifice is caught in a beaker, or glass container, and measured, and that determines the beating degree of the pulp." If the pulp is finely beaten the calibrated screen in the upper container will be closed considerably, with the result that the water will not run as fast into the lower container as it would if the pulp were coarsely beaten.

In this connection the witness testified:

In other words, when they calibrate the machine they determine the exact dimensions of the lower orifice; running free water through at 20° C. it will run through in a certain length of time without any fibers mixed up in it. And, of course, when the fibers are mixed up the coarseness or fineness of the fibers will determine how fast the water would go through here; and being that the lower orifice will only allow a certain amount of water through, if the water is rushed through more will go through the upper orifice if the fibers are beaten coarsely. If they are beaten fine the water would not run as freely into the lower orifice and, therefore, it would get more into the calibrated orifice and let more into the upper orifice.

It is also disclosed by the testimony that the fibrous material which is collected on the calibrated screen in the upper cylinder or container "is the same as that which comes off the regular paper machines." A certain amount of water is pressed out of the material and then it is placed in an oven to dry. "Then they cut samples from this piece of paper that is formed and determine the tensile strength, and the bursting strength, and other physical characteristics to determine whether they are getting the same type of paper, or the same sheet as they manufactured before." Precisely how these characteristics are determined is not explained. Nevertheless, the tests accomplished by means of the device above described enable the manufacturer to ascertain if a certain batch of stock in the paper-making machine has been sufficiently beaten to produce the same type of paper as had been manufactured previously.

It appears that in paper mills when these testers are not available "it has been the habit of experienced beater men to put the hand into the beater and pick out a sample and feel it and guess at whether it is beaten fine enough. That has been the custom before freeness testers were adopted."

Upon the foregoing facts we are asked to determine whether the importations are properly classifiable as "machines, finished or unfinished, not specially provided for," or as "parts" thereof, within the meaning of paragraph 372 of the Tariff Act of 1930, or whether they should be classified as parts of machines for making paper pulp or paper under said paragraph 372, as amended by the trade agreement with Sweden, *supra*.

We shall first consider the question whether the imported article is a machine in and of itself.

It is difficult to formulate an exact and precise definition of the word "machine." However, our appellate court many years ago designed a pattern outlining the common attributes of a machine, namely, "a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion." *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537. That definition, with appropriate limitations, has been applied in numerous subsequent cases, and by it we shall be guided in solving the

problem now before us. Commenting thereon, the same tribunal in *United States* v. *Janson Co.*, 16 Ct. Cust. Appls. 315, T. D. 43075, said:

The definition of a machine thus given was in conformity with the rule theretofore announced by the Federal Courts. *Corning* v. *Burden*, 15 How. 252 (267); *American Steel & Wire Co.* v. *Downing Wire & Fence Co.*, 160 Fed. 108.

In excluding certain carpenters' braces from the definition of a machine the court, in *United States* v. *Wm. Goldenblum & Co. et al.*, 18 C. C. P. A. (Customs) 367, T. D. 44616, described the use and structure of the articles as follows:

A carpenter's brace is used for turning boring bits or drills, and consists of a crank-formed shaft—"sweep"—with jaws at. one end for holding a bit or drill, and a swiveled head at the other end, by which the brace and, consequently, bit or drill is pressed forward by the operator, who, by turning the crank-formed shaft—"sweep"—with his hand, imparts a rotating motion to the bit or drill.

The imported articles may be used for boring holes in metal or wood, and are always operated by hand power.

By means of the ratchet attachment, the bit or drill, when desired, is turned in one direction only, so that, when the operator reverses the motion of the crank-formed shaft, the bit or drill does not change position. Accordingly, by means of this attachment, the operator may handle the brace in a very limited space.

In support of the contention that these braces were machines in the tariff sense of the term, the importers had invoked the definition set forth in the *Simon, Buhler & Baumann* case, *supra*. The court disagreed with that contention, saying:

We are unable to agree with the views of counsel for appellees. If it is proper to hold that the imported articles utilize, apply, or modify energy or force, or that they are mechanical contrivances for the transmission of motion, within the meaning of the definition announced by this court in the *Simon, Buhler & Baumann* case, then every tool, no matter how simple, is a machine within that definition. * * *. Obviously, a holding that the involved articles are machines for tariff purposes would result in reducing the definition of machines to an absurdity. It is true that, by virtue of the leverage obtained, the operator of one of the involved tools is able to apply more power or force to the bits or drills. It is likewise true that, by increasing or decreasing the length of the crank-formed shaft—"sweep"—of the tool, the leverage would be increased or decreased, and correspondingly greater or less power could be applied to the bits and drills.

The mere fact that these tools, solely by virtue of leverage, furnish a mechanical advantage—increased power—is not sufficient to bring them within the provision for all other machines, finished or unfinished, not specially provided for, contained in paragraph 372. We are of opinion that the involved articles do not utilize, apply, or modify energy or force, or transmit motion, within the meaning of the definition of machines announced by this court in the *Simon, Buhler & Baumann* case, *supra*, and we so hold.

Also, in *United States* v. *Adler-Jones Co.*, 20 C. C. P. A. (Customs) 397, T. D. 46231, the court made this very significant observation:

* * *. The definition given in the *Simon, Buhler & Baumann* case, *supra*, is quite broad, and it must be applied under the limitations made necessary by the facts of any case in which its application is sought. * * *.

See also *United States* v. *The Cottage Creamery Co.*, 22 C. C. P. A. (Customs) 290, T. D. 47346; *United States* v. *Race Co.*, 22 C. C. P. A. (Customs) 327, T. D. 47362; *United States* v. *National Folding Box Co.*, 24 C. C. P. A. (Customs) 316, T. D. 48756; *United States* v. *J. E. Bernard & Co., Inc.*, 28 C. C. P. A. (Customs) 182, C. A. D. 142; and *United States* v. *Associated Mfg. Co.*, 30 C. C. P. A. (Customs) 236, C. A. D. 238.

Applying the principles of the cited cases to the facts before us we are clearly of the opinion that the freeness tester is not a machine within the statutory provisions relied upon by the plaintiff. There is nothing in the record to establish that it is "a mechanical contrivance for utilizing, applying, or modifying energy or force or for the transmission of motion," as those words have been judicially interpreted. The only movable parts of the tester, aside from the pet cock, appear to be the cover, and the bottom, of the upper cylindrical container described above, and the so-called cam levers by means of which they are opened and closed. There is no testimony to indicate whether the cam levers operate manually or mechanically. However, as before stated, it is fairly inferable from an examination of exhibit A that they are operated by very simple manual effort in which the principle of leverage is applied. It is no more complicated than are ordinary bolts, iron bars, latches, etc., commonly used to fasten doors. In our opinion the so-called cam levers do not possess sufficient legal leverage to raise the apparatus of which they form a part to the dignity of a machine within the meaning of paragraph 372, as judicially defined. They do not utilize, modify, or apply energy or force or transmit motion in the legal sense.

Neither do we think that the force of gravity which causes the water to flow from the upper chamber or cylinder into the funnel-shaped chamber beneath it, nor the presence of the pet cock, requires any different conclusion. We accordingly hold that the freeness testers in controversy are not machines, as claimed by plaintiff.

We shall next consider whether the articles should be classified as "parts" of machines under paragraph 372, *supra*, or, more particularly, as parts of machines for making paper pulp or paper under said paragraph, as modified by the Swedish Trade Agreement, *supra*.

The rule is well settled that "a 'part' of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article*." [Italics quoted.] *United States* v. *Willoughby Camera Stores, Inc.*, 21 C. C. P. A. (Customs) 322, T. D. 46851; *United States* v. *Herman H. Sticht & Co.*, 22 id. 40, T. D. 47048; *St. Alban's Episcopal Church* v. *United States*, 22 id. 366 T. D. 47387; *United States* v. *Mitchell Camera Corp.* 22 id. 544, T. D. 47553; *United States* v. *Carl Zeiss, Inc.*, 24 id. 145, T. D. 48624; *Steel, Inc.* v.

*United States*, 24 id. 423, T. D. 48872; *Daprato Statuary Co.* v. *United States*, 26 id. 173, C. A. D. 13; *Wilbur-Ellis Co.* v. *United States*, 26 id. 403, C. A. D. 47; *United States* v. *E. Leitz, Inc.*, 26 id. 418, C. A. D. 49; and *Steel, Inc.* v. *United States*, 28 id. 77, C. A. D. 128.

The evidence before us falls far short of establishing that the freeness tester "is something necessary to the completion" of a machine for making paper pulp or paper. Neither does the record prove in the slightest degree that the tester is "an integral, constituent, or component part," without which the paper pulp or paper-making machine could not function as such. The device lacks the inherent attributes outlined by our appellate court in *United States* v. *Willoughby Camera Stores, Inc.*, *supra*, and the other cases above cited, to be properly characterized as a "part" of any machine. As the witness frankly stated, where freeness testers are not available, experienced beater men pick out samples of the stock from the beater and "guess at whether it is beaten fine enough." Upon this phase of the case we hold, for the reasons expressed above, that the freeness tester is not a part of a machine for making paper pulp or paper, nor is it a part of any other machine.

It follows, therefore, that the protest must be and hereby is overruled in all respects, and the decision of the collector of customs is affirmed.

Judgment will be entered accordingly.