EXCELSIOR NEEDLE CO. v. MORSE–KEEFER CYCLE–SUPPLY CO.

MORSE–KEEFER CYCLE–SUPPLY CO. v. EXCELSIOR NEEDLE CO.

(Circuit Court of Appeals, Second Circuit. April 3, 1900.)

No. 128.

1. PATENTS—INVENTION—WIRE-SWAGING MACHINES.
    The Dayton patent, No. 474,548, for a swaging machine, is void for anticipation and lack of invention in view of the prior art, and especially of the Miller patent, No. 364,274, and the Peck patent, No. 428,572, both for swaging machines, and the Brown & Sharpe machine for cutting screws.

2. SAME—INFRINGEMENT.
    The Dayton patent, No. 492,576, for a swaging machine, acting in combination with an automatic feed and cutting device, as to the first four claims, covering broadly the application of feeding and cutting devices, properly timed, to swaging machines, and claim 6, is void for want of patentable invention, and anticipation by the Kaiser patent, No. 33,707, for a needle machine, and the Breedon machine, for making wire blanks. Claims 5, 8, and 9, in so far as they cover a variable connection between the cutter plate and pinchers for determining the position of the cutter, involve invention. Also *held* infringed by machines made under the Morse patent, No. 588,648.

Cross Appeals from the Circuit Court of the United States for the District of Connecticut.

This cause comes here upon cross appeals from a decree of the circuit court, district of Connecticut. 97 Fed. 627. The suit was brought upon two patents owned by complainant, viz. No. 474,458, May 10, 1892 (application filed October 12, 1891), to William H. Dayton, for a swaging machine, and No. 492,576, February 28, 1893 (application filed September 21, 1892), to William H. Dayton, for machine for swaging wire. The earlier patent contains three claims, all of which the circuit court held invalid for want of patentable invention; from which decision complainant has appealed. The later patent contains nine .claims. The seventh was not declared on. The first, second, third, fourth, and sixth were held invalid for lack of invention, from which decision complainant has appealed. The circuit court, however, held that the fifth, eighth, and ninth claims of this later patent were valid, and infringed, from which decision defendant has appealed.

H. A. Seymour and Frederick P. Fish, for complainant.
Alfred Wilkinson, for defendant.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.   The patentee has been connected for 35 years with the Excelsior Needle Company, the complainant, a manufacturer of steel articles such as needles, bicycle spokes, etc., and assigned both patents to it.   The machines built under these patents have been used for the manufacture of double-butt swaged bicycle spokes, and, as the bicycle industry increased enormously during the period between 1893 and the taking of the proofs in this case, it is not surprising to find that the output of such spokes has run up into the millions.   The double-butt swaged bicycle spoke appears to be an improvement upon those which preceded it, viz. the "straight," the "upset," the "drawn," and the "single-butt swaged"; but there is no indication that any effort was ever made to patent it.   The patent in suit, No. 474,548, which, it is claimed, first made it practicable to swage by machine a spoke having a butt, or enlarged and unswaged portion, at each end, does not, from beginning to end, contain any reference to bicycle spokes.   It is adapted to swage wire for needles or other purposes to different diameters without stopping the machine.   A piece of metal, such as a wire blank, is swaged by subjecting it to repeated blows, and rotary machines for doing this work were well known before this patent.   There is, of course, a general similarity between such machines.   The blows are administered by suitable blocks of metal called dies, between which the wire is fed. These dies are arranged in a revolving head, power-worked to rotate at a very high rate of speed, and which is itself inclosed within a stationary shell.   This rotation produces centrifugal motion in the dies, causing them to separate, until they (or additional "die blocks" or "followers," which contact with the dies) strike against projections, spoken of as "tappets" or "rollers" secured to the shell, and which protrude into the circular pathway, through which the dies or followers revolve.   As soon as they come in contact with these projections, the dies are driven sharply in a centripetal direction, and their faces strike the wire.   The high speed of rotation produces a very large number of blows per second, and, when the portion of the wire subjected to such action has been swaged, the blank is moved further along, and a new portion submitted to the strokes of the dies.   The mode of operation will be readily understood from an inspection of an earlier patent to Dayton, No. 376,144, Jan. 10, 1888, for machine for swaging needle blanks.   It had been found by experience with sewing machines that the needle sometimes became heated by friction.   To avoid this, it seemed desirable to produce a needle of which the body above the eye should be reduced in size.   To accomplish this result, Dayton reorganized an earlier machine so as to swage the needle "of a smaller diameter at one part than at another part."   The following figure from No. 376,144 illustrates that machine, a being the rotating shaft, b the stationary shell, and 1 the rollers, of which there are a dozen, arranged around the interior of the shell.

101 F.—29

Fig. 1.

The specification of this patent states that, to effect the object of swaging to a smaller diameter at one part than at another part, "the followers, o, are made wider [i. e. deeper from front to rear on the line of the shaft] than the dies, c, and the dies, c, are pressed forward by the springs, v, so that their front surfaces rest against the back surface of the ring, f, when in a normal position, and the faces of the followers, o, and of the dies, c, where they come together, are slightly inclined; hence, when the springs, v, are compressed by the dies, c, backwardly, the faces of the dies will be brought closer together. I am therefore able to pass in between the dies a cylindrical article, such as a previously reduced needle blank, such blank being contained in a suitable holder, and by pressing the end of the holder against the outer ends of the dies, c, such dies are gradually pressed backwardly against the springs, and they approach closer together as the reducing or swaging operations progress. In the manufacture of needle blanks the wire is passed into one or more swaging ma-

chines, and reduced to the diameter of the needle at the point. Then the needle blank is placed in a holder that allows the cylindrical portion of the needle body to project the proper distance, and then the blank is passed in between the dies, c, which in their normal condition are sufficiently wide open for the needle to pass freely between their faces, so that the point portion of the needle blank projects inwardly beyond the die faces, and by pushing the end of the holder against the outer ends of the dies as they revolve the dies will be brought closer together, and the body of the needle will be reduced, leaving the point portion of the needle blank untouched." This machine having been devised, as was said before, to effect an improvement in sewing-machine needles, its terminology is confined to the manipulation of needle blanks. It is quite apparent, however, that it is, as its inventor asserted, capable of swaging to different diameters on the same blank, and, that being so, it can be easily adapted to deal with diameters greater than a needle's, and to swage a bicycle spoke with a double butt. Such arrangement would be a mere matter of adjustment of parts, and of appropriate insertion of the blank in the holder. This machine, however, would be slow, by reason of the lack of automatic features. The operative's hand and skill would be continually required to adjust and readjust the blank in the holder, to insert the thicker portion beyond the range of the dies' activity, and to make the dies functionally efficient by pressing back the springs and the dies with them until the roller tappets could impart to the latter the motion necessary to swage to the smaller diameter. What was needed was such mechanism as would enable the dies to be quickly thrown out of effective operation without stopping the machine, so as to permit a section of the wire to be passed through the dies without being acted upon by them, and also to enable the dies to be quickly thrown into effective operation while the machine is running, and cause them to swage any desired length of wire to a uniform diameter; and all this without the necessity of constant adjustment or readjustment in a holder. To make the machine efficient, it would seem to be necessary at least to reduce the function of the operative to the mere throwing in and throwing out of the dies by means of mechanism associated with the very machine in which the dies are located.

One other earlier patent should be considered before setting out the patent in suit. It is No. 364,274, June 7, 1887, to Miller, for machine for swaging needle blanks. The specification states that:

"In the machines of the class referred to, adjustment of the dies, either to compensate for the loss of metal by wear or resurfacing, or for swaging different sizes of needles, has heretofore been effected by inserting steel plates or 'filling pieces' of varying thickness between the dies and the contact blocks. [This patentee calls the die blocks or followers "contact blocks."] But this means of adjustment has been found objectionable, and unsatisfactory, and the object of my invention is to overcome the inconvenience incidental thereto. This object I accomplish by providing wedges, which are interposed between the dies and contact blocks, and may be adjusted as may be desired to adjust the dies. * * * The inner ends of the contact blocks are beveled to correspond to the bevel of the wedges."

A single figure from his patent will sufficiently display Miller's device:

*Fig. 1.*

A is the rotary die holder, grooved or recessed for the reception of the dies, B, and contact blocks, C. The rollers or tappets are not shown in this figure; they impinge upon the outside of the contact blocks. The wedges are shown at D, D, and are arranged with an elbow through which runs the screw, F, in a slot, which gives the wedge play enough to and from the axis of rotation to partake of the centrifugal and centripetal motion of the dies and contact blocks.

The patent in suit, No. 474,548, refers to the patentee's earlier one, No. 376,144, in which "there are dies which can be moved in contact with inclined surfaces so as to cause these dies to approach nearer together, or the reverse."

"I find, however," says the patentee, "that in many swaging operations the dies as they revolve around the article to be swaged should remain in one position. [It will be remembered that in No. 376,144 the dies moved forward and back, and as they thus moved up or down the sloping surfaces upon which they abutted they came nearer together or receded further apart. The patentee's first suggestion, therefore, is to have the sloping surfaces on which the dies abut alone partake of the forward and backward movement, the result of which, because of the slope, will be the same as in 376,144, so far as the consequent approach or recession of the dies is concerned.] Swaging machines have also been made with wedges adjusted by screws for varying the

action of the dies; but these wedges could only be moved when the machine was at rest. [This is a reference to the Miller patent, supra.] The object of the present invention is to give a movement to the inclined devices in a direction parallel, or nearly so, to the axis of rotation of the dies, and during their rotation, in order that the inclined surfaces may cause the dies to come closer together, or the reverse, and thereby, with the same dies, forge or swage articles of different diameters without stopping the machine, or forge a round article that varies in diameter in different parts of its length."

The machine of this patent is best shown in Fig. 2.

The specification proceeds as follows:

"The dies, A, B, are adapted to slide radially [that is, to have centrifugal and centripetal motion] in the revolving head, C, of the shaft, D, and their adjacent faces are recessed semicircularly, and more or less tapering, so as to be adapted to swaging the intended article; and around the head, C, is a stationary shell, E, and within this shell are the rolls, F, or equivalent devices, for pressing the dies towards each other as the shaft, D, and head, C, are revolved. I provide an inclined surface that is movable endwise in relation to the dies, so that the die-actuating devices may act more or less upon the dies,—that is to say, to bring them nearer together, or allow them to be further apart; and the end motion is given to the inclined surfaces in any suitable manner during the operation of the machine, the dies themselves revolving in a fixed position relatively to the movable inclined surfaces. Several devices for effecting these objects have been devised by me, and will be the subject of separate applications; but in the drawings I have represented convenient devices for use, and which illustrate the features of this invention."

"The dies, A, B, are represented as within a cross groove in the revolving

head, C, and held therein by the removable cap plate, G, and there are die blocks, H, H, in line with the dies, A, B, and against which the rolls, F, act, and these are held in position by the cap plates, K. The wedges, L, L, intervene between the dies and die blocks, and they are movable endwise, so that, when the thicker portions of the inclined surfaces of the wedges are between the die blocks and dies, the dies will be brought closer together than they will be when the thinner parts of such wedge are in operative positions. The cross pin or key, M, passes into holes in the wedges, and the pin is within a slot in the shaft, D, which slot is elongated in the direction of the length of the shaft, and the key, M, is connected to or formed with the adjusting tube, S,—that is, within the shaft, D,—and such tube, S, is provided with a grooved head that is acted upon by a forked lever or other convenient device so as to move such tube, S, endwise in the shaft, and regulate the position and action of the wedges."

The claims are:

"(1) The combination, with the swaging dies and means for closing the same, of inclined surfaces and mechanism for moving the inclines during the action of the dies for causing the dies to perform the swaging operation when either nearer together or further apart, substantially as set forth. (2) The combination, with the swaging dies and the revolving shaft and head carrying the same, of wedges, means for moving the wedges endwise during the swaging operation, and die-actuating mechanism controlled in its action on the dies by the wedges, substantially as set forth. (3) The combination, with the revolving shaft and its head, of dies and die blocks and mechanism for closing the dies, and wedges intervening between the dies and die blocks for varying the action of the dies, and the adjusting tube within the revolving shaft, and the connections to the wedges for moving the same, substantially as set forth."

It will be observed that this first claim is a very broad one. It is not confined to the wedges which are made a characteristic element of the third and fourth claims, but covers "inclined surfaces" generally. The swaging dies are old, and the same is true of the "means for closing the same," being the tappets or rollers which impart centripetal motion to the dies. "Inclined surfaces" were old. We find them in Dayton, 376,144, where the dies and contact blocks engage, motion up or down the slope bringing the dies nearer together or further apart. In this last-cited patent it is an endwise motion of the dies which causes them to mount or to descend the incline, while in the patent an endwise motion of the contact blocks produces the same result; but there is no more invention in such an exchange of function between engaging parts than there was in the glove-fastener case, where an earlier patentee had inserted a resilient stud into a rigid socket, and a later one made the stud rigid and the socket resilient. Fastener Co. v. Hays (C. C. A., 2d Cir., Feb. 28, 1900) 100 Fed. 984. That a movement of the inclines would "cause the dies to perform the swaging operation when either nearer together or further apart" is shown in both of the earlier patents supra. In Dayton, 376,144, the inclines were moved during the action of the dies, but that operation was effected by the hand of the workman pressing the end of the holder against the outer ends of the dies, or withdrawing such pressure. The one element in the claim not already found in prior combination is the substitution of "mechanism" (any suitable mechanism; its details are no part of the claim) for the hand of the operative. The particular "mechanism" shown in the patent is not automatic. It is itself operated by the workman's

hand, but it is a part of the machine, combined with the other old elements, thereby producing a combination not found in No. 376,144. The only ground, therefore, on which this first claim of 474,548 can be sustained must be the finding that Dayton was the first to introduce into a swaging machine mechanism whereby inclined surfaces located at the base of the dies could be reciprocated endwise while the machine was running, thereby causing the dies to perform the swaging operation when either nearer together or further apart. But the record in this case will not warrant such a finding.

On May 20, 1890, United States patent No. 428,572 was issued to F. A. Peck for a machine for reducing wire. It is a complicated apparatus, but is sufficiently shown in the annexed Fig. 3, from which certain continuous feeding mechanism located to the left of the drawing has been eliminated.

*Fig. 3*

D is the "beater holding head" or shell. K, K, are the "beaters,"—the rollers or tappets of other patents. Their surfaces are inclined, and so are the surfaces of the dies, O, O, which engage with them. As shown in the drawing, the die head, E', is thrust forward, and, mounting the surfaces of the inclines on K, K, the dies have separated so as to give clearance for the largest size of wire the machine is adjusted to receive. It is manifest that, if the die head be retracted, the dies will descend the slopes, and be brought nearer together, and the rotating of the die head at any particular part of the endwise motion would swage to the particular diameter. The specification states that in the operation of the machine the beater holding head, D, may be clamped, and held stationary. "Upon revolving the pulley, F, the arbor, E, and die head, E', will revolve therewith, and the action of the worm, e, of the pulley, F, upon the worm-gear, G, will cause the revolution of the crank, H, and the consequent reciprocation of the die head, E', within the beater head, D, and as the die head, E', is carried onward, the inclined position of the beaters, K, K, will allow the dies to open outward to receive a new length of wire, which length of wire will be reduced in size as the head, E', is being drawn back within the head, D, by the continued action of the crank, H, the dies being carried nearer and nearer to each other until the head, E', has reached its inner limit, and then

the continued action of the crank, H, will again carry the head, E', forward, causing the dies to open, so as to receive another length of wire," etc. It is true that the complicated mechanism employed causes the die head to reciprocate rapidly and constantly, and the whole machine is organized to feed wire continuously, and reduce it to a diameter proportioned to the closest approach of the dies; but these details, which secure constant feed and quick reciprocation, may be discarded. When discarded, the "inclines" are left with mechanism forming a part of the machine, and adapted to give them endwise motion forward or backward while the machine is running at full speed. So much being accomplished, it would seem to require but the ordinary skill of the mechanic to add "a forked lever or other convenient device" to start or to check the mechanism which imparts such motion. In view of the Peck patent, it cannot be found that Dayton was the first to introduce into a swaging machine "mechanism" (kind not specified) whereby inclined surfaces located at the base of the dies could be reciprocated endwise during the action of the dies. The first claim of No. 474,548 is, therefore, void for lack of invention.

The second and third claims may next be considered. The revolving shaft, and its head carrying the dies, are therein enumerated, but they were certainly implied in the first claim by the statement that the dies were to perform a swaging operation. In both of them we have instead of the broad phrase "inclined surfaces" the more concrete word "wedges"; in the second claim wedges so placed that their movement will control the action of die-actuating mechanism on the dies, and in the third claim wedges intervening between the dies and die blocks. The presence or absence of die blocks or followers would seem to make no differnce in the novelty of the combination. The prior art knew of them. Sometimes it used them and sometimes it dispensed with them. In Miller 364,274, supra, we have wedges intervening between dies and die blocks, which bring the dies nearer together when pushed in, and further apart when retracted, and which thus "control the die-actuating mechanism in its action on the dies," or "vary the action of the dies." Moreover, these wedges are held in place by an arrangement of pin (the screw, F) and slot, which not only adjusts them longitudinally, but permits them to vibrate centrifugally and centripetally in unison with the dies when the machine is in operation. Moreover, we have in the prior art wedges inserted and retracted during the operation of a machine. They are found in the Brown-Sharpe machine, a slight modification of a device shown in United States patent 51,257, November 28, 1845, to Joseph R. Brown for a screw-cutting machine. The blank to be cut is griped and held at the end of a revolving spindle, an operation performed by combining with suitable griping jaws a set of wedges at the end of a rod or tube within the spindle, and a rotating screw for imparting a sliding motion to the said rod or tube and the wedges thereon, so that the wedges are made to force the griping jaws together to gripe the rod or piece of metal, and afterwards to liberate the same while the spindle is revolving.

## The Brown and Sharpe Machine.

. We have here, as defendant contends, "a rotating head carrying dies operated by a tubular shaft, a second tube within the shaft, wedges elastically, but not rigidly, secured to the end of said tube, and arranged back of die blocks, means for moving said tube and wedges longitudinally while the whole mechanism is rotating to force the dies nearer together or to permit them to fly further apart." That the wedges operate back of the die blocks, and not between them and the dies (as shown in Miller 364,274), is immaterial. The griping device shown in this screw-cutting machine is a proper reference within the rule followed in Briggs v. Duell, 36 C. C. A. 40, 93 Fed. 972, and in view of it, and of the wedges shown in Miller, with their vibratory motion, secured by a slot playing on a pin, there would seem to be no patentable invention in the second and third claims of Dayton 474,548, with the wedges, adjusting tube, and connections therein set forth. We therefore concur in the finding of the circuit court as to the invalidity of this patent.

### Dayton Patent No. 492,576.

The patent we have already discussed was for a "hand" machine: The will of the operative, acting through his hand, fed in the material to be swaged, divided it into appropriate lengths, and regulated the times during which the dies should remain near together, swaging to the smaller diameter, and during which they should remain sufficiently far apart to accommodate the passage of the wire when of the larger diameter. It was, of course, highly desirable that mechanism should be devised to perform all these functions, and thus largely increase the output. Patent No. 492,576, the second one declared upon in the complaint, covers such mechanism, It de-

scribes in full detail a complicated system of cams, levers, rockers, and all the other well-known mechanical contrivances whereby motion is timed, applied, withheld, and translated. The machine of the patent is an ingenious one, and discloses patentable invention. The patentee, however, has endeavored in some of the claims to embrace a field of invention far wider than he was entitled to occupy. A prior patent (No. 33,707, to Kaiser, November 12, 1861, for an improvement in machinery for making needles), and a prior machine, known as the "Breedon Machine," for producing short and straight wire blanks for needles, show what might have been expected, viz. that it was old to supplement machines for performing some particular operation on wire with automatic devices for feeding the wire and cutting it into appropriate lengths, so timed as to work in unison with the rest of the machine. The specification states that:

"By the present improvement the wire or rod is passed in at one end of the machine, and subjected to the swaging operation, and it is drawn along through the swaging dies as the proper reduction is accomplished, and one or more complete articles are thus swaged, after which the articles are cut off successively, and delivered from the machine. In carrying out the invention, any suitable swaging apparatus may be made use of,—such, for instance, as that represented in letters patent No. 474,548, granted to me May 10, 1892,—and the wire as fed into the machine is preferably passed through a straightener, and the longitudinal movement is given to the wire by pinchers that grasp the partially or entirely finished blank, and draw the same along, together with the wire that is being swaged; and the wire is then held in a stationary position while the pinchers are opened, and returned to the point of beginning to take a fresh hold; and the completed article is cut off, and drops away from the machine."

The first four claims of the patent read as follows:

"(1) The combination, with the swaging mechanism, of pinchers for grasping the article to be swaged, mechanism for giving motion to the pinchers to draw the article through between the swaging dies and a holding clamp for holding the article operated upon, and mechanism for opening the pinchers, and returning then to take a fresh hold for drawing through another length, substantially as set forth. (2) The combination, in a swaging machine, of dies for effecting the swaging mechanism, for actuating such dies, pinchers for holding the article to be acted upon, mechanism for opening and closing the pinchers and moving them longitudinally for drawing the article to be swaged through between the dies, substantially as set forth. (3) The combination, with rotary swaging dies and mechanism for opening and closing the same, of pinchers for grasping the article to be acted upon, and mechanism for moving the pinchers, and drawing the article along between the swaging dies, a clamp for holding the article when the pinchers are opened, and a cutter and mechanism for actuating the same to separate the swaged article from the wire or stock, substantially as set forth. (4) The combination, in a swaging machine, of swaging dies, rotary mechanism for actuating such dies, a moving wedge or backing for varying the closing of the dies, pinchers and mechanism for opening and closing the same and for moving the pinchers longitudinally for drawing the article to be swaged along between the dies, a clamp for holding the material when the pinchers are opened, and a cutter for separating the swaged article, substantially as set forth."

That these claims were intended to be just what they appear to be—a far-sweeping dragnet to cover the application of feeding and cutting devices, properly timed, to swaging machines—is manifest from the language of the specification. "This invention," says the patentee, "is especially intended for the swaging of wire in the manufacture of spokes for wheels, but is available in the manufacture of

other round articles, and especially those that can be made from a continuous wire." By the use of this language the patentee expressly extends the confines of the art, of which his machine is to form a part, so as to include the needle-making machine of Kaiser and the wire needle blank machine of Breedon. Later on in the specification we find:

"By the foregoing description of this apparatus as adapted to the manufacture of wire spokes, it is not to be understood that the improvement is limited in this particular, but that the devices may be employed for swaging other articles, and the swaging action may be either continuous or intermittent. I have described the present improvements in connection with a revolving swaging device, but it will be apparent that in cases where the device that is being manufactured is not circular, the improvements are available with any character of swaging device whether it revolves so as to act all around the circular article, or whether it may remain stationary, and only act at opposite sides of the article being swaged."

The patentee assumed that in No. 474,548 he had a valid patent for a swaging machine, which would swage wire to one diameter for a certain length, and then open the dies to allow a part of the wire, fed in by hand, to pass unswaged. The field of further invention was open to him. He could devise mechanism whereby the feeding and cutting should be automatically performed in connection with the swaging operation of the machine itself; and, if the mechanism thus devised possessed patentable novelty, he could patent it. Precisely this he did. He devised such mechanism. It is novel and ingenious, and he has patented it. But by these four claims he has sought to go much further, and to foreclose any one else from adding either to the machine of No. 474,548, or to any other swaging machine capable of doing its work, devices for feeding, drawing, holding, and cutting, well known in the prior art, even though the mechanism whereby they are connected and operated should be unlike that which he himself devised. This he was not entitled to, and, having thus enlarged his claims, the court should not be astute to restrict them by reading in the real invention which he has failed to include within their terms. We concur with the circuit court in the conclusion that the first four claims are void for lack of patentable invention.

The sixth claim reads:

"(6) The combination, in a machine for swaging wire spokes, of revolving swaging dies and mechanism for moving and regulating the action of said dies, pinchers, and mechanism for opening and closing the same, a cam and variable lever mechanism for regulating the longitudinal movement given to the pinchers and varying the length of the spoke, substantially as set forth."

This claim differs from claim 2 by the addition of the "cam and variable lever," etc. We concur with the circuit court that these are sufficiently shown in the Breedon machine.

The remaining claims of the patent (except the seventh, which is not declared on) are:

"(5) The combination, with swaging dies, of pinchers, mechanism for opening and closing the same, and for moving them longitudinally, and carrying the article longitudinally between the swaging dies, a cutter for separating the swaged article, and a connection between the cutter and the pinchers, whereby the cutter is brought into position by the movement of the pinchers, substantially as set forth." "(8) The combination, with the swaging mechanism, of

the revolving shaft through which the wire to be swaged passes, and which shaft carries the swaging mechanism, pinchers, and means for opening and closing the same to grasp or relieve the wire, a cam and intervening connections to the pinchers for giving motion to such pinchers to move the wire between the swaging dies, a cutter plate and cutter movably supported upon the machine, and a variable connection between the cutter plate and the pinchers for determining the position of the cutter, and mechanism for giving motion to the cutter, substantially as set forth. (9) The combination, with the swaging mechanism, of the revolving shaft through which the wire to be swaged passes, and which shaft carries the swaging mechanism, pinchers, and means for opening and closing the same to grasp or relieve the wire, a cam and intervening connections to the pinchers for giving motion to such pinchers to move the wire between the swaging dies, a cutter plate and cutter movably supported upon the machine, and a variable connection between the cutter plate and the pinchers for determining the position of the cutter, mechanism for giving motion to the cutter, and a clamp for holding the wire during the return movement of the pinchers, substantially as set forth."

These claims were sustained by the circuit court because they cover, inter alia, "a variable connection between the cutter plate and pinchers for determining the position of the cutter." The soundness of this conclusion is not disputed, the defense relied on being non-infringement. This presents substantially a question only as to the meaning of the word "variable," as used in the claims. We do not deem it necessary to add anything to the brief discussion of this question in the opinion of the circuit court, and concur in its conclusion that defendant's machine infringes these three claims. The decree of the circuit court is affirmed, without costs.