## HAYNES STELLITE CO. v. CHESTERFIELD et al.

(District Court, E. D. Michigan, S. D. October 23, 1925.)

No. 482.

1. Patents ⬅157(1)—Relation of patent in suit to other related patents, including those issued to patentee, considered in ascertaining effect on art.

Relation of patent in suit to other related patents, issued to patentee as well as others, must be considered to ascertain effect of patent in suit on art.

2. Patents ⬅157(2)—Patent revolutionizing art more readily sustained, when patentability is doubtful.

When patentability is doubtful, courts are more ready to sustain patent which has revolutionized art, on ground that its features must have enough novelty and utility to warrant patent.

3. Patents ⬅36—Commercial utility, to be evidence of invention, must be due to improvement of patent in suit.

While commercial utility of invention may be considered in cases of doubtful validity or infringement, such utility, to be evidence of invention, must be due to improvement of patent in suit.

4. Patents ⬅161—Patentee given benefit of forward movement resulting from patent in suit only.

Patentee must be given benefit of such forward movement in art as has resulted from patent in suit only, as distinguished from those made by related patents, granted to him or others, and used in same business.

**5. Patents ⊙⟋7, 12—Patents for alloys, methods and machines used in making them, and particular uses thereof, may be secured.**

Patents for methods or machines used in making alloys, alloys themselves, or particular uses made of alloy or articles made therefrom, may be secured, if usual requirements of patentability, such as utility and novelty, are present to such degree as to render improvement a patentable invention, and not merely such a step forward as ordinary person skilled in art could make.

**6. Patents ⊙⟋37—Whether prior patents and disclosures are for alloy per se, process or machine used in manufacture, or particular use made of alloy or article made from it, need not be determined.**

Whether prior art patents and disclosures are for alloy per se, process or machine used in its manufacture, or particular use or article made of alloy or article made therefrom, need not be determined in construing patent in suit, as applicant's or patentee's claim is limited by what has been shown or disclosed, as well as claimed, in past.

**7. Patents ⊙⟋37—Patentee cannot claim earlier disclosures, though not claimed or patented.**

Applicant for patent cannot claim things of value disclosed in past, though not claimed or patented.

**8. Patents ⊙⟋328—Metal alloy covered by Haynes patent, No. 1,057,423, held disclosed by prior British patents, if not by Haynes patent, 873,745.**

Alloy of cobalt, chromium, and tungsten, for which Haynes patent, No. 1,057,423, was issued, held disclosed by prior British patents, if not by Haynes patent, No. 873,745, for binary alloy of cobalt and any one of chromium group.

**9. Patents ⊙⟋40—One discovering new use for old alloy cannot repatent and obtain valid claims for such alloy per se.**

One disclosing new use for metal alloy, old in art, cannot repatent and obtain valid claims for such alloy per se.

**10. Patents ⊙⟋167(1)—Specification cannot be used to change claim.**

While claim should be read and interpreted in light of specification, latter cannot be used to change claim.

**11. Patents ⊙⟋328—Claims for alloy per se cannot be interpreted as claims for tools or articles which specification states may be made from such alloy.**

Claims for alloy per se covered by Haynes patent, No. 1,057,423, cannot be modified and interpreted as claims for tool or article, which specification states may be advantageously made from such alloy.

**12. Patents ⊙⟋328—Claims of Haynes patent, No. 1,057,423, for alloy of cobalt, chromium, and tungsten, held invalid, as too broad.**

First four claims of Haynes patent, No. 1,057,423, for alloy of cobalt, chromium, and tungsten, without restriction as to proportions, use, or method of manufacture, held invalid, as too broad.

**13. Patents ⊙⟋37—Alloy per se cannot be claimed, if resistance element made of such alloy is old.**

If resistance element made of certain alloy is old, no one can later validly claim same alloy per se.

**14. Patents ⊙⟋41—When combination of elements or ingredients is old, only specific proportions, method of manufacture, or use can be validly claimed.**

New combination of elements or ingredients, producing new result in way involving something more than ordinary skill, may be patented, if involving sufficient novelty and utility, and one adding still further element or ingredient and getting new or improved results can obtain further patent; but, when combination broadly is old, there can be no valid claims, apart from specific proportions, method of manufacture, or use.

**15. Patents ⊙⟋177—One seeking patent for certain proportions of metals forming old combination must give instructions and proportions sufficiently definite to be followed and used without experiment.**

If broad combination of metals is old, one seeking patent for certain proportions of metals forming such combination must give instructions and proportions sufficiently definite to be followed and used without experiment, and such patent must be scanned more carefully and closely than that for broad combination, though particular purpose for which alloy is to be used is a very wide and varied one.

**16. Patents ⊙⟋17—Test of sufficiency of instructions as to specific proportions of metals in alloy sought to be patented stated.**

Test as to whether patentee's instructions as to specific proportions of metals in alloy sought to be patented are sufficiently definite to be of value and importance to art, where broad combination is old, is whether man ordinarily skilled in art would be able to take such step himself without assistance of patent.

**17. Patents ⊙⟋328—Claims 5 to 8 of Haynes patent, No. 1,057,423, for alloy of cobalt, chromium, and tungsten, held valid, as step forward in art.**

Claims 5 to 8 of Haynes patent, No. 1,057,423, for alloy of cobalt, chromium, and tungsten, held valid as cutting off portions of field and calling for better alloy for some purposes than disclosed by prior patents or publications, though one taking patent would still have much experimenting to do to make good alloy for purposes described, and others had previously suggested proportions within field reserved for patentee.

**18. Patents ⊙⟋177—Patent for specific proportions of ingredients in combination broadly old narrowly construed.**

Patent for specific proportions of ingredients in combination or composition broadly old should be narrowly construed, and patentee given no more than he claimed.

19. Patents ⬤⇒328—Valid claims of Haynes patent, No. 1,057,423, for alloy of cobalt, chromium, and tungsten, held not infringed by use of such alloy with addition of carbon and nickel.

Haynes patent, No. 1,057,423, for alloy of cobalt, chromium, and tungsten for making high-speed metal-cutting tools, *held* not infringed by use of such alloy with addition of carbon and nickel, not specified in such patent; addition of carbon being further step forward in art than that from binary alloy of cobalt and any one of chromium group, covered by Haynes patent, No. 873,745, to ternary alloy of patent in suit, and nickel making alloy less apt to chip.

In Equity. Suit by the Haynes Stellite Company against Percy C. Chesterfield and another. Bill dismissed.

Edward N. Pagelsen, of Detroit, Mich., Charles Neave and Maxwell Barns, both of New York City, and Clinton P. Townsend, of Washington, D. C., for plaintiff.

Myron J. Dikeman, of Detroit, Mich. (Charles W. Hills, Charles W. Hills, Jr., and Ridsdale Ellis, all of Chicago, Ill., of counsel), for defendants.

TUTTLE, District Judge. This is an action for alleged infringement of letters patent issued to Elwood Haynes on April 1, 1913, No. 1,057,423, for "metal alloy," on an application filed July 20, 1912.

Preliminary to the decision, I desire to put on the record observance of the death of the patentee during the trial of this lawsuit. During the days of the contest, involving alleged infringement of this patent, the man who secured the patent left the battle of business and life here with us. Elwood Haynes, the patentee in this case, was a man who had written his name very high and very big, not only on this art, but in the business world. He was a founder of the automobile industry, and it is a real and decided loss to the art and to the business world that he should have passed away. There has been no lack of respect to Mr. Haynes or to his memory in allowing this lawsuit to proceed during the days following his death, rather than taking an adjournment. He was himself so active in business affairs that we would better commemorate his own conduct by ourselves being busy in trying to do our duty than by taking an adjournment and being idle.

Haynes' alloy consisted of cobalt, of the iron group, which also includes nickel and iron, and metals of the chromium group, which comprises the four elements, chromium, tungsten, molybdenum, and uranium.

The patentee, Haynes, has a series of patents relating to alloys of the above metals, and to distinguish the patent in suit from related patents to Haynes for binary and quaternary alloys it will be referred to as the ternary patent.

The ternary patent is for an alloy composed of cobalt and at least two metals of the chromium group. More specifically the ternary patent relates to alloys of cobalt, chromium, and tungsten. The binary alloys of cobalt and any one of the chromium group had already been patented by Haynes in patent No. 873,745, issued December 17, 1907. This will be referred to as the binary patent.

Haynes also, after disclosing and fully describing quaternary alloys of cobalt and three members of the chromium group in the ternary patent, obtained claims specific to such quaternary alloys in patent No. 1,057,828, which patent is a divisional of the ternary patent in suit. Further, in patent No. 873,746, issued December 17, 1907, Haynes discloses and claims alloys of nickel and any one of the chromium group. Various uses of these alloys are described and set forth in these patents, although in the patent in suit particular emphasis is laid upon their use as lathe or machine tools. Defendants' alloy is manufactured and sold for use as lathe or machine tools. These alloys are used as lathe or machine tools, for the reason that they possess the property of "red hardness." In other words, when they become heated during the cutting operation, they retain their hardness. The softening point of these alloys is at a higher temperature than in the case of so-called "high-speed" steels, which in turn have a higher softening point than ordinary carbon steels.

While there may be some dispute about it, I think it is pretty well agreed that the ideal cutting tool for use in the lathe to cut iron and steel is made up of what can be called a matrix and the harder, more abrasive, particles carried in the matrix. The matrix itself, however, needs to be strong as compared with many other things. You could not make the matrix out of soap and put diamonds into it and make a cutting tool. The ideal tool—the alloy that will cut the hardest of metals when used as a cutting tool—needs to have those two characteristics. The reason for this is that you could not get a tool which would be entirely made of anything so hard as these small crystals or particles that we are talking about.

All of the claims in the patent in suit are relied upon. They are as follows:

"1. A metal alloy composed of cobalt and at least two of the metals of the chromium group.

"2. A metal alloy composed of cobalt, chromium, and other metal allied with chromium.

"3. A metal alloy composed of cobalt, chromium, and one other metal of the chromium group.

"4. A metal alloy composed of cobalt, chromium, and tungsten.

"5. A metal alloy composed of cobalt, chromium, and other metal allied with chromium, in the proportion of not more than sixty per cent. (60%) of the metal allied with chromium, the remainder of the alloy being cobalt and chromium.

"6. A metal alloy composed of cobalt, chromium, and other metal allied with chromium, in the proportion of from five per cent. (5%) to sixty per cent. (60%) of such metal allied with chromium, the remainder of the alloy being cobalt and chromium.

"7. A metal alloy composed of cobalt, chromium, and one other metal of the chromium group, in proportion of not more than sixty per cent. (60%) of such metal of the chromium group, the remainder of the alloy being cobalt and chromium.

"8. A metal alloy composed of cobalt, chromium, and tungsten, in proportion of from five per cent. (5%) to sixty per cent. (60%) of tungsten, the remainder of the alloy being cobalt and chromium."

The alloy which defendants manufacture comprises essentially nickel, cobalt, chromium, tungsten, and carbon, and according to complainant's figures analyzes as follows:

| | |
|---|---|
| Cobalt | 26.39 |
| Chromium | 28.98 |
| Tungsten | 26.90 |
| Nickel | 14.17 |
| Carbon | 1.29 |
| Impurities | 2.27 |
| | 100.00 |

[1] As is usual in patent cases, the defendants claim that the patent is invalid, or, if valid, that they do not infringe. As already pointed out, we are dealing with a patent which is but one of several closely related patents granted to the same patentee. In every patent case the relation of the patent in suit to other related patents must be considered, in order to ascertain what effect the patent in suit has had on the art, and this applies to prior patents issued to the patentee in suit, as well as those of others.

[2] If a patent has revolutionized an art, the courts are more ready to sustain it on the ground that the features covered thereby must have enough novelty, and more particularly utility, to warrant the reward of a patent. Such considerations, however, are only controlling when the question of patentability is doubtful. Charles Boldt Co. v. Nivison-Weiskopf Co., 194 F. 871, 114 C. C. A. 617 (6 C. C. A.); Coffield v. Sunny Line Appliance, Inc., 297 F. 609 (C. C. A. 6); Indiana Lamp Co. v. Alvo Mfg. Co., 296 F. 623 (C. C. A. 6).

[3] While in cases of doubtful validity or infringement the court may consider the commercial utility of the invention, it is clear under the authorities that commercial utility to be evidence of invention must be due to the improvement of the patent in suit. Fielding et al. v. Crouse-Hinds Electric Co., 154 F. 377, 83 C. C. A. 331 (C. C. A. 2); Locklin et al. v. Buck, 159 F. 434, 86 C. C. A. 414 (C. C. A. 2).

[4] The plaintiff must be given the benefit of such forward movement in the art as has resulted from the patent in suit as distinguished from the advances made by the related patents. In other words, the patent in suit must not be given credit for things to which it is not entitled, and which are due to other patents granted to the same patentee (or to others) and used in the same business. Hence in this case, and in every case where there are a series of similar patents granted to the same patentee, including the same thoughts, the same ingredients, and covering products sold under the same trade-mark or trade-name, unusual care is required on the part of the court.

Here the name "stellite" has been applied to the products, not only of the patent in suit, but also to the products of all other similar or allied patents. Whatever help all of these patents have been to the art has all been grouped in thought on the part of the public, and is liable to be on the part of witnesses, or even on the part of the court, as attributable to and to be credited to the particular patent that we happen to be thinking about at that instant. So it should be borne in mind that there are several patents to Haynes, involving alloys for the same or similar uses, and that all these alloys and products made therefrom are known as "stellite."

[5] In patents relative to alloys, it is possible to secure patents for the methods used in making the alloys, patents on the machines used for making the alloys (if machines were used for making the alloys), patents

for the alloys themselves, or patents for the particular uses made of the alloy or the articles made therefrom, provided, of course, that the usual requirements of patentability are present, such as utility and novelty, to such a degree that the improvement rises to the dignity of a patentable invention, and is not merely such a step forward as the ordinary person skilled in that art would be able to make. It seems clear that in this case we are dealing with a patent on an alloy per se, more particularly and specifically an alloy consisting of cobalt and any two of the four metals of the chromium group. We must keep this in mind in determining the novelty and utility of the claims of the patent in suit and deciding the question of infringement.

[6, 7] While, in construing the patent in suit, it is important to determine whether it is for the alloy per se, the process or the machine used in its manufacture, or a particular use or article made of the alloy, it is not necessary to make such classification of the prior art patents and disclosures. This follows from the fact that an applicant for a patent or a patentee is limited in what he can validly claim, not only by what has been *claimed* in the past but by what has been shown and *disclosed* in the past. If in the history of the art some patentee has disclosed things of value, but for some reason has not claimed them, one seeking a patent at a later date cannot successfully claim those earlier things that were disclosed, even though those earlier things were not claimed or patented.

Here we have claims for an alloy per se, and in studying the history of the art to determine their novelty and also the breadth of interpretation to be given them, we must look, not only at patents claiming alloys per se, but also to all patents which have disclosed alloys. This, of course, includes Haynes' earlier patents, since his own patents are as much a part of the prior art and stand as much in the way of this patent as they would if they had been granted to some one else. His own skill and genius made discoveries in the art prior to the patent in suit, and those discoveries made by him and disclosed by him prior to the patent in suit developed the art and limited his opportunity for invention just as much as though those valuable things had been done and disclosed by others.

[8] In his binary patent Haynes claimed cobalt and any one of the four metals of the chromium group in such broad terms that, if some one else, immediately following the issue of the binary patent, had used two of the metals of the chromium group, Haynes could have urged with a good deal of force that there was infringement. It would have been a question for very serious consideration whether such person was not merely substituting an equivalent, when he took half of one and half of another metal of the chromium group for one of the same group as taught by Haynes in his binary patent. I do not need to reach that conclusion here, but I mention it to show that Haynes' binary patent did suggest and strengthen defendants' contention that, in view of the prior art, there was no patentable novelty in the ternary alloy. However, apart from any question of patentability of the ternary alloy, in view of Haynes' own earlier binary patent, it is plain that prior to the patent in suit ternary alloys of cobalt and two metals of the chromium group had been disclosed. I think that Boult's (Marsh) British patent, No. 2,129 of 1906, Thompson's British patent, No. 7,847 of 1895, and Leffler's British patent, No. 16,829 of 1891, and other publications, lead irresistably to the conclusion that an alloy of cobalt and two of the four metals of the chromium group was old in the art.

[9] I am not now talking about the use to which such alloy or alloys were put, as that is rendered unnecessary by the fact that the patent in suit is for the alloy per se, and is therefore anticipated by the prior disclosure of the alloy, regardless of the particular use to which it might have been put. If the ternary alloy was old in the art, then, even though Haynes had some new use for such alloy, he cannot repatent the old alloy and obtain valid claims for the alloy per se.

[10] While it is true that claims should be read and interpreted in the light of the specification, for the purpose of understanding the meaning of the claim, the specification cannot be used for the purpose of changing the claim and making it different from what it is. As remarked by Mr. Justice Bradley, in White v. Dunbar, 119 U. S. 47, 52, 7 S. Ct. 72, 74 (30 L. Ed. 303):

"The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms."

See, also, Howe Machine Co. v. National Needle Co., 134 U. S. 388, 10 S. Ct. 570, 33 L. Ed. 963; Cincinnati Railway Supply Company v. American Hoist & Derrick Co.,

8 F.(2d)—49

143 F. 322, 74 C. C. A. 522 (C. C. A. 6); U. S. Repair & Guaranty Co. v. Assyrian Asphalt Co., 100 F. 965, 41 C. C. A. 123 (C. C. A. 7); Excelsior Needle Co. v. Morse-Keefer Cycle Supply Co., 101 F. 448, 41 C. C. A. 448 (C. C. A. 2); Denning Wire & Fence Co. v. American Steel & Wire Co. of New Jersey, 169 F. 793, 95 C. C. A. 259 (C. C. A. 8).

[11] As Haynes made his claims for the alloy per se, and not for the tool or article made from the alloy, the courts are powerless to modify his claims, and interpret them as claims for a tool or article, merely because the specification states that certain kinds of tools or articles may advantageously be made out of that alloy. To do otherwise would mean that the claims could be ignored, and the question of patentability would resolve itself into ascertaining whether there was anything of patentable novelty or utility *disclosed* in the specification.

[12] At some time or other it was discovered that by taking two metals you could alloy them together and get a result that was better for certain purposes than either of them taken alone. If there had been a Patent Office in existence at that early date, the person who made such discovery would be entitled to a patent; but to-day, with the history of the centuries back of us, we could not let a man come in and make a claim for alloying metals together, and then read his specification and say: "While your claims are the broadest in the world, we will hold your patent valid because there is included in the specification something of merit, something worthy of patentable protection."

I do not understand that the plaintiff claims that such is the law, and I use that extreme illustration to bring out the thought I have in mind in this case. The first four claims of the patent in suit are for a metal alloy composed of cobalt and at least two of the four metals of the chromium group. They are for the alloy of these metals in the broadest terms, without restriction as to proportions or use or method of manufacture. In endeavoring to cover everything, the patentee made his claims so broad that he loses everything.

[13] These patent cases illustrate the old story of the boy who put his hand down through the narrow neck of a jar to get the nuts in the jar, and got his hand so full of nuts that he could not take it out of the jar. That is the way these broad claims work. In the anxiety to get the whole world within the claim and cover everything, the patentee makes them so broad that they cov-

er nothing. That is true of the first four claims. They are so broad that they include what is old and so protect nothing. Thus Marsh might have claimed the ternary alloy in his British patent, No. 2,129 of 1906, had he disclosed the alloy been new even in his day, since he discloses a resistance element consisting of cobalt and one or more of the chromium group. If a resistance element made of a certain alloy is old, then the alloy itself is old, and no one can later validly claim the same alloy per se.

[14] Any person who picks out two, three, or any number of elements or ingredients, and makes a new combination or composition of matter that nobody else has combined, and gets a new result, has done something for whatever art he produces the new result in, and may secure a patent for the combination or composition of matter, provided the combination of such elements or ingredients involves sufficient novelty and utility to import patentability. Then, if some one adds a further element or ingredient to the old combination or composition of matter, and gets new or improved results, he can obtain a further patent, provided the utility and novelty are of high enough degree. But, when the combination broadly is old, there can be no valid claims apart from the specific proportions, method of manufacture, or use. Either or both the proportions and method of manufacture may be patentable, if the elements or ingredients are combined in new proportions, or in a new way involving something more than ordinary skill to produce the new result.

It may be that, if some one tells us what metals to use, that is all that is necessary. In making a cake, it may be enough to tell the cook what ingredients to use, while in other cases you will have to tell her the amount of each ingredient to use. If all you want is cake, merely naming the ingredients —flour, baking powder, etc.—*without giving* the amounts, may be sufficient. But if you want a certain kind of cake, then you have to give the cook the particular amounts—a definite recipe.

[15, 16] Haynes, in claims 5, 6, 7, and 8, gives some indication as to proportions, but, even in these claims his limits are so wide and his claims so indefinite that I have had doubts as to their validity. In fairness to Haynes it ought to be recognized, and I do recognize, that the particular purpose for which he is proposing to use his alloy is a very wide one and a varied one. For cutting the various kinds of iron and the various kinds of steel you are going to need tools

made of alloys of different compositions. On the other hand, it should always be kept in mind that if the alloy, the broad combination, is old, any one attempting to obtain a patent for certain proportions of the metals forming such a combination owes a duty to give instructions and proportions sufficiently definite, so that they can be followed and used without experiment. We must scan such a patent with more care and more closely than we would the patent of the man who discovers the broad combination, because, the combination being old, his patent depends upon his specific proportions. It must be definite enough and narrow enough to be of more help to that art than just being told to take the two, three, or more elements which go to make up the combination or composition of matter. The steps from the general, broad instruction to use the constituent elements, without reference to proportions, to the instructions as to specific proportions given by the patentee, must be sufficiently definite to be of value and importance to the art, in order to be rewarded by a patent, and the test is whether or not a man ordinarily skilled in the art would be able to take this step himself without the assistance of the patent.

[17] How far must such a patent go in defining the proportions of the ingredients? It is plain that, when the broad combination is old, you cannot merely say, "Put in more than 1 per cent. and less than 99 per cent." That would not help the art. Haynes goes farther than that, and he is dealing with a broad art that has many uses. I have serious doubts, however, as to whether, the combination being old, his claims are sufficiently restricted to be valid. However, he gives to the art in his specification an interesting, and in my belief and judgment a true, discussion of the art as it was. He carried the art farther than it had been disclosed at that time, by telling new things about the problem, new things that had not been disclosed before about the particular part played by the different metals that went into this combination, and he helped the art by cutting off certain portions of the field. By following the instructions of claims 5, 6, 7, and 8, you would, I think, get a better alloy for some purposes, not for all purposes, than had previously been disclosed by any of the prior patents or publications. While Haynes cut off some of the territory into which one ought not to go to make a good alloy, he included too much in the territory which he left. He did not narrow down his proportions, so as to be of nearly as much assist-

ance to the art as was possible, if he had understood it more fully. In other words, one taking his patent, in order to make a good alloy for the purposes Haynes described, would still have a lot of experimenting to do. He has cut off a lot of places where there are no fish, but the area which he left contains a lot more places where likewise there are no fish, and one has to anchor in a good many places in the area prescribed before one can catch the fish one wants and needs. While, therefore, there is absolutely no question but what the first four broad claims must be held void, I am inclined to hold claims 5, 6, 7, and 8 valid, because I feel and believe that he disposed of a lot of useless territory. It is true that others had previously suggested proportions within the field which Haynes reserved for himself, but Haynes, by his patent, eliminated sufficient field to warrant my holding the claims valid.

[18] I recognize that holding these claims valid is almost in violation of the rule I laid down in holding the first four claims invalid, viz., that, the alloy per se being old, Haynes could not repatent the alloy per se, since claims 5, 6, 7, and 8 include proportions which had previously been disclosed. I am holding these claims good and valid on the theory that they are a step forward; that is, they taught the art something. While holding these claims valid, I am mindful of the fact that a patent for specific proportions of ingredients in a combination or composition of matter broadly old should be narrowly construed, and the patentee should not be given more than he claimed.

[19] In view of prior art, including the prior patents to Haynes and other facts brought out in the trial of this case, it cannot be said that the patent in suit is the one which has revolutionized the art. The demand for high-speed tools did not long precede the patent in suit. The patent in suit was preceded by the so-called "high-speed" steel, which helped to revolutionize the art. Various other alloys, made in accordance with prior patents, contributed much to the art of cutting iron and steel. It is pretty well agreed that the ideal cutting tool for high-speed work on iron or steel is made up of what can be called a matrix and harder, more abrasive particles carried in the matrix. In the commercial product of both plaintiff and defendant, these hard, abrasive particles consist of carbides.

If one compares the step forward made by adding another metal (carbon-free) of the chromium group to the binary (carbon-free) alloy of Haynes' prior patent with the

step forward made by adding carbon to the carbon-free ternary alloy of the patent in suit, there is no question but what the addition of carbon is a bigger step and a farther step forward in the metal-cutting art than the step from the binary to the ternary alloy. The addition of the carbon is the big step in this art. I have no doubt about that. The carbon is small in amount, but big in results. Every one, including plaintiff as well as defendant, agrees that for most purposes you get a better cutting tool made from an alloy that has some carbon in it, and more carbon than will get in accidentally. Carbon is purposely added to make a good tool.

If there is any one thing on this record that seems to me clear and certain, it is that carbon is needed in order to make the best tools. However, it is true that you could make a cutting tool which would be useful for some purposes from an alloy substantially carbon-free by selecting certain definite proportions of metals. That is one reason why I am holding claims 5, 6, 7, and 8 valid.

Did Haynes teach the addition of carbon? It is beyond dispute that he did not teach it anywhere in the patent in suit. If any one puts in carbon, it must be because they know enough to do it without and in spite of the teachings of this patent. In the binary patent he says to keep it out, but he says to keep it out for a particular reason, which is that presence of carbon in the alloy tends to make it tarnishable. The ternary patent makes specific reference to the binary patent. I am inclined to the plaintiff's view of the patent in suit, to the effect that, in order to tell about his ternary alloy, he referred to what he had already done with his binary alloy as described and disclosed in his binary patent. I do not think that he referred to the binary patent in such a way as to infer that he wished every one to do everything exactly as he taught in his binary patent, but that his real motive in referring to the binary patent was to explain how he had made a step forward from the latter. Nevertheless, he does not tell us to put carbon in, and he had previously told us to keep it out, and that is the only thing relative to carbon that he said to the art.

Carbon does many things: It increases corrosibility or tarnishability, it increases hardness, which is probably a good thing for defendants' purposes, and it lowers the melting point, which is probably a bad thing for such purposes. As carbon is added in increasing quantities, the carbon, combining with the tungsten to form tungsten carbide, goes into solution in the cobalt and chromium, and strengthens the matrix until the solution reaches saturation. Beyond the saturation point, free tungsten carbide crystals are formed, which are held in the matrix, and are harder than the matrix, and have abrasive strength, which is very helpful to the cutting tool. Increase the carbon still further, and in addition to carbide crystals you get graphite, which weakens the metal.

Now, with all these different uses, some helpful and some harmful, the addition of carbon was an important thing to be taught to the art, a necessary thing, and a thing that even those skilled in the art did not know. In my judgment, the addition of carbon is a bigger step forward than using an additional metal in the alloy. The effect of carbon would require more experimenting than that of the other ingredients of the alloy, because of the several different effects and uses produced and obtained by the addition of carbon. Many ingredients influence the properties of an alloy or composition of matter in one direction only, but in carbon you have an ingredient which will strengthen the alloy up to a certain point, and above that point will weaken it. These different effects —some good and helpful, and some bad and harmful, some helpful with small quantities of carbon, and harmful with large quantities—make it unusually important that the addition of carbon should be mentioned, and mentioned as to amount. It is not mentioned at all in this particular patent. If there is any suggestion at all—and in the binary patent there is more than a suggestion—it is to keep it out. The ternary patent, taken alone, is absolutely silent as to carbon. From my standpoint, even if he had not taught to keep it out in his binary patent, I should have reached the same conclusion. The necessity for and the effect of the addition of carbon was not, in my opinion, something that those skilled in the art knew at the time Haynes filed his application for the patent in suit. The addition of carbon to the ternary or other similar alloy was, when discovered, of enough importance to warrant the grant of a patent therefor. We do not, therefore, have a case where an equivalent has been added, since carbon has functions and uses entirely different from those of the metallic constituents of Haynes' ternary alloy. It is not a case where an additional ingredient, having known effects and uses, has been added. We are not dealing with a case where an element or ingredient has been added merely for the purpose of evading the patent. On the contrary, no commercial alloy of cobalt, chromium, and tungsten has been shown to me, which has been sold or

used by anybody, that would successfully cut cast iron and steel, unless it had more carbon in it than would get in by accident. The authorities are clear that under such circumstances there is not and cannot be any infringement. Walker on Patents (5th Ed.) 457; Gill v. Wells, 22 Wall. 1, 14, 22 L. Ed. 699; Fuller v. Yentzer, 94 U. S. 288, 296, 24 L. Ed. 103; Pittsburg Iron & Steel Foundries Co. v. Seaman-Sleeth Co., 248 F. 705, 160 C. C. A. 605 (C. C. A. 3).

Defendants not only use carbon, but also nickel, in their alloy, and there is no disclosure in the patent in suit of the use of nickel in alloys of the character in question. I am of the opinion that nickel serves a useful purpose in the alloy. Of course, it is cheaper than cobalt, but that alone would not avoid infringement. It gives a certain quality to the alloy, which is not present when cobalt alone, of the metals of the iron group to which nickel belongs, is used. It makes the alloy less apt to chip. Hardness and brittleness may be desirable for some classes of work, but for others it is desirable to put in nickel to reduce the brittleness. Nickel has qualities quite different from cobalt. Its addition to the cobalt-chromium-tungsten alloy brings to it new, and for some purposes very advantageous, properties, so that the same law that I apply with reference to the carbon will apply to the nickel. The addition of nickel is not anywhere near as important as the addition of the carbon, although in amount ten times as much nickel is added as carbon. The results from the small amounts of carbon are very, very big, and the results from the nickel are comparatively small. However, if 'Haynes' ternary patent in suit is valid, when in his binary patent he had said that you could use cobalt and any one of the chromium group—if Haynes could get a good patent by telling you to use two of the chromium group, instead of one—then necessarily the same rule applies to the use of two metals of the iron group, viz., nickel and cobalt, instead of one, viz., cobalt.

I think the use of nickel alone and apart from carbon avoids infringement. The addition of carbon and nickel in the substantial proportions here used, neither of them specified in the patent in suit, which is a proportion patent, a formula patent, a recipe patent, are enough to avoid infringement. So, in conclusion, claims 1, 2, 3, and 4 are held invalid, and claims 5, 6, 7, and 8 valid, but not infringed.

The bill is dismissed.